# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 45379-7-II |
| Respondent, | PART PUBLISHED OPINION |
| v. | |
| ALFRED JAMES THIERRY, JR., | |
| Appellant. | |

BJORGEN, J. — The State charged Alfred James Thierry Jr. with four counts of first degree child rape and two counts of first degree child molestation, based on conduct against his son, JT.[1] A jury returned guilty verdicts on all counts. Thierry appeals, contending that prosecutorial misconduct in closing argument deprived him of a fair trial and the sentencing court erred in imposing various terms of community custody. Thierry also submits a pro se statement of additional grounds for review, contending among other matters that the trial court should have allowed him to present the testimony of a certain witness and should not have admitted evidence that JT suffered psychological trauma. Because the prosecutor invited the jury to decide the case on an improper basis, and the misconduct likely affected the verdict, we reverse.

---

[1] Pursuant to General Order 2011-1 of Court of Appeals, Division II, the name of the minor will be indicated with initials.

FACTS

In October 2012, Mujaahidah Sayfullah heard eight-year-old JT, her adopted son,[2] say the word "humping," which she considered "inappropriate." 5 Verbatim Report of Proceedings (VRP) at 123-24. She asked where he had learned that word. When he "got quiet" and "didn't want to talk" about it, Sayfullah asked him if anyone had ever touched him inappropriately. 5 VRP at 123-24. JT eventually disclosed to Sayfullah and her husband that Thierry, JT's biological father, had "placed his penis in [JT's] bottom" when JT had visited Thierry. 5 VRP at 123-24.

Sayfullah took JT to see pediatric nurse practitioner Tracy Lin and related her concerns that JT may have suffered sexual abuse. JT disclosed to Lin that Thierry had put "[h]is penis inside [JT's] bottom . . . [m]ore than once when [JT] was 4 year[s] old, 6 year[s] old and 8 year[s] old." 6 VRP at 114. Lin advised Sayfullah to report the abuse allegation to police, which Sayfullah did.

Keri Arnold-Harms, a child interviewer with the Pierce County Prosecuting Attorney's Office, conducted a video recorded interview with JT. During the interview, JT described several specific instances of sexual abuse. JT stated that these incidents occurred "sometimes when [he] spent the night at [Thierry's] apartment," explaining that it happened "many times" at the apartment, one time at his grandmother's house, and one time at the home of Thierry's "wife," Lorrie Robinson.[3] Ex. 1.

---

[2] Sayfullah is the sister of JT's biological mother and has raised him since he was three days old. Thierry did not have formal visitation rights, but occasionally visited or had JT stay overnight with him by mutual agreement with Sayfullah.

[3] Thierry described Robinson at trial as his "fiancee." 7 VRP at 61.

JT began counseling sessions at the Comprehensive Life Resources Children's Advocacy Center with mental health therapist Amber Bradford, to whom he also eventually disclosed that Thierry had sexually abused him. JT also described psychological symptoms to Bradford, such as nightmares, self-blame, and intrusive thoughts about or memories of the abuse. During counseling with JT, Bradford wrote out his story, including descriptions of the abuse, more or less as he told it, although she admitted that many of the words JT used came from "flash[ ]cards" that she provided. 6 VRP at 79-82. Bradford also acknowledged that in counseling sessions she makes no attempt to determine whether a child has truthfully disclosed the abuse, gives the children positive reinforcement when they talk about the abuse, and suggests particular feelings or symptoms that they might be experiencing.

1.      Pretrial Procedure

The State charged Thierry with four counts of first degree child rape and two counts of first degree child molestation. Thierry pled not guilty and proceeded to trial.

The trial court held a hearing under RCW 9A.44.120 and ER 803 on the admissibility of child hearsay testimony concerning statements JT made to Sayfullah, Lin, Arnold-Harms, nurse Michelle Breland, and Bradford. The court ruled the testimony admissible, including the recording of JT's interview with Arnold-Harms.

2.      Trial Testimony

At trial, the State's witnesses testified to the facts as described above. The trial court admitted the video recording of JT's interview with Arnold-Harms into evidence, and it was shown to the jury.

JT testified, generally describing the abuse consistently with his prior statements, except as to the timing and dates of specific incidents. His testimony concerning the timing of various events was internally inconsistent and differed in some respects from his previous statements.

On cross examination, defense counsel elicited testimony from JT that, shortly before he told Sayfullah about the abuse, he had asked Thierry if he could go to live with Thierry and Robinson, but Thierry refused. Robinson testified on Thierry's behalf, stating that JT was very happy to visit Thierry, was reluctant to leave, and often talked about wanting to move in with Thierry.

Thierry testified on his own behalf and denied the sexual abuse accusations. He described one incident, however, in which he woke up and JT was touching Thierry's penis. Thierry testified that he responded by saying, "What the hell? . . . Man, do not do that. If you ever want to see me again, that will not happen." 7 VRP at 98. He testified that, later that morning, he and JT and another male relative, one year younger than JT, were kneeling on the bed looking out the window at a squirrel and that Thierry's penis "might have grazed the back of" JT. 7 VRP at 96. Thierry could not think of any reason why JT would accuse him, but stated that he had a conversation with JT about living together, but had decided against it.

3.    Closing Argument, Verdict, and Sentence[4]

After a few preliminary remarks, the deputy prosecutor's closing argument turned to an explanation of direct versus circumstantial evidence. This explanation included the following:

> None of you were present when these acts occurred. No one testified for you that they watched any of these acts happen. That would be direct evidence of the acts themselves, but *that is not required and*, *if it were*, *the State could never prosecute any of these types of cases.*

---

[4] Because we resolve the prosecutorial misconduct claim based only on that portion of the prosecutor's closing argument to which Thierry objected before the trial court, our discussion here focuses on the language and context of that particular argument.

8 VRP at 89-90 (emphasis added). She made a similar argument shortly thereafter, in a discussion of the sufficiency of the State's evidence:

> Did [Thierry] rape and molest his son [JT]? Yes, he did. The evidence tells you that he did. What's the evidence? [JT] is the evidence, and he is all that is required for you to find [Thierry] guilty of these crimes. If the law required more, if the law required anything, something, anything beyond the testimony of a child, the child's words, [JT's] words, those instructions would tell you that, and there is no instruction that says you need something else. And, again, *if that was required*, *the State could rarely*, *if ever*, *prosecute these types of crimes* because people don't rape children in front of other people and often because children wait to tell.

8 VRP at 93 (emphasis added). She again returned to this motif near the end of her initial closing remarks, in discussing the burden of proof:

> Now I want to talk just briefly about the standard of beyond a reasonable doubt. You don't need to know all of the pieces. You don't need to have all of the information or have all of the answers. If that were necessary, first of all, the standard would be beyond all doubt possible, but *if that were necessary*, *once again*, *the State would not be able to prosecute any of these crimes* or really any crime, actually, because how can you all as jurors who are selected from the community know nothing about any of the people involved, and certainly yourselves were not present for any act or crime that was committed, how can you know with 100 percent certainty?

8 VRP at 106-07 (emphasis added).

Thierry did not object to any of these arguments during the deputy prosecutor's initial remarks. In her closing argument, defense counsel suggested that JT may have initially accused Thierry because Sayfullah and her husband "confronted" JT about using words "in a household in which those words are not used," and JT "need[ed] to explain those words away." 9 VRP at 6. She then sought to exploit inconsistencies in JT's statements about when specific instances of abuse occurred and differences between his statements and those of Sayfullah and other witnesses to undermine his credibility.

Defense counsel also offered other possible explanations for why JT might have falsely accused Thierry. First, she argued that JT may have continued making allegations in his counseling sessions because he received positive feedback from Bradford, who suggested particular words to use with her flashcards. She also suggested that JT's anger and disappointment at not getting to live with Thierry may have motivated the accusations.

Defense counsel then continued her efforts to rehabilitate Thierry's credibility, making the following argument:

> You know, something terrible did happen in this case, and that's the story and these accusations. It's a good thing to tell kids who may have been abused, "You didn't do anything wrong. You're not going to get in trouble." It's a good thing to positively reinforce kids, but it's a very terrible thing when you help them to create the worse [sic] story any of us can imagine, that Al can imagine, with his own son, and how do you fight it? How do you prove that something did not happen? Well, you can't, but if you're willing to get up there on the witness stand, even though you have the right to remain silent, and face the lawyers trying to pin you down, your thought processes are going to come out. "I racked my brain. This is something that happened way back when." He didn't have to tell you that, but he did because the man is totally without guile and he just wanted the truth out.

9 VRP at 14. The State objected that defense counsel was vouching for a witness, and the judge instructed the jury that they would be "the sole determiners of who is telling the truth and who isn't, not Counsel and not" the judge. 9 VRP at 14.

Defense counsel then briefly returned to the topic of inconsistencies in JT's statements and his possible motives to lie. Finally, she concluded her argument by suggesting that JT may be "punishing [Thierry] in some way and doesn't really understand the import of what he's saying," arguing that JT's "story has way too many inconsistencies and things that cannot be explained," and urging the jury to return not guilty verdicts. 9 VRP at 16.

6

The prosecutor began her rebuttal by addressing defense counsel's statement, made in the context of discussing Bradford's testimony, that adults should tell children who may have suffered abuse that they did not do anything wrong and are not in trouble:

> [Defense counsel] says, "It's a good thing to tell kids, 'Tell someone if you've been abused. You're not going to get in trouble.'" She said, "It's a good thing to make sure that they know that they can tell when this has happened to them." That statement contradicts everything that she just stood up here and argued to you about. How is it a good thing when basically the crux of her argument is, "They aren't going to be believed. Children can't be believed. There's never any other physical evidence. We can't believe what they say because they make up stories," so *how is it a good thing to tell them that they should tell somebody because we're going to bring them in here to court to have a Defense attorney say, You can't believe them.*"

9 VRP at 16-17 (emphasis added). The prosecutor continued in this vein, returning to her public policy theme:

> [Defense counsel] wants you to basically disregard everything that [JT] has said between what he told [Sayfullah], between what he told Ms. Arnold-Harms, between when he told his primary care provider Ms. Lin and what he told Amber Bradford. "Just disregard all of that because he's a child, because he was 8 when he said these things and because he was 9 when he was on the stand. Nothing he said is credible so just disregard it all." *If that argument has any merit, then the State may as well just give up prosecuting these cases, and the law might as well say that "The word of a child is not enough."*

9 VRP at 17 (emphasis added). At that point Thierry objected that the prosecutor was "fueling the passion and prejudice of the jury,"[5] to which the prosecutor responded that hers was "[n]o worse than Defense Counsel's argument." 9 VRP at 17. The court overruled the objection and permitted the prosecutor to continue.

---

[5] After closing argument, defense counsel clarified outside the presence of the jury that she specifically objected to the prosecutor's argument that, if the jury accepted the defense theory, "we might as well stop prosecuting cases," which she thought "went over the line as far as fueling the passion and prejudice of the jury." 9 VRP at 31. The court disagreed.

The jury returned guilty verdicts on all counts. The sentencing court imposed community custody for life in the event Thierry is ever released, with numerous conditions. Thierry appeals.

ANALYSIS

In the published portion of this opinion, we hold that the prosecutor committed prejudicial misconduct which had a substantial likelihood of affecting the verdict, and we reverse Thierry's convictions on that ground. In the unpublished portion, we decline to resolve his other challenges, although we briefly discuss certain of them.

I. PROSECUTORIAL MISCONDUCT

Thierry contends that several of the remarks the deputy prosecutor made in closing argument merit reversal. He alternatively contends that the cumulative effect of the improper statements denied him a fair trial. We agree with Thierry that the deputy prosecutor's argument on JT's credibility was improper and that it had a substantial likelihood of affecting the verdict.

1. Standard of Review

Prosecutors act as quasi-judicial officers who "represent[] the people and presumptively act[] with impartiality in the interest of justice," and therefore "must subdue courtroom zeal for the sake of fairness to the defendant." *State v. Thorgerson*, 172 Wn.2d 438, 443, 258 P.3d 43 (2011). Prosecutors "owe[] a duty to defendants to see that their rights to a constitutionally fair trial are not violated." *State v. Monday*, 171 Wn.2d 667, 676, 257 P.3d 551 (2011). Thus, although prosecutors enjoy "wide latitude to argue reasonable inferences from the evidence," they "must 'seek convictions based only on probative evidence and sound reason.'" *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012) (quoting *State v. Casteneda-Perez*, 61 Wn. App. 354, 363, 810 P.2d 74 (1991)), *petition for cert. filed*, No. 15-36 (July 9, 2015).

As a general matter, to prevail on a prosecutorial misconduct claim a defendant must show that the prosecutor's conduct was both improper and prejudicial "in the context of the record and all of the circumstances of the trial." *Glasmann*, 175 Wn.2d at 704. "Allegedly improper arguments should be reviewed in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given." *State v. Russell*, 125 Wn.2d 24, 85-86, 882 P.2d 747 (1994).

To establish prejudice sufficient to require reversal, a defendant who timely objected to the challenged conduct in the trial court must "show a substantial likelihood that the misconduct affected the jury verdict." *Glasmann*, 175 Wn.2d at 704. Even plainly improper remarks from a prosecutor do not merit reversal "if they were invited or provoked by defense counsel and are in reply to his or her acts and statements, unless the remarks are not a pertinent reply or are so prejudicial that a curative instruction would be ineffective." *Russell*, 125 Wn.2d at 86.

2.  Appeal to Passion or Prejudice

   A. The Argument Was Improper

   It is improper for prosecutors to "'use arguments calculated to inflame the passions or prejudices of the jury.'" *Glasmann*, 175 Wn.2d at 704 (quoting AMERICAN BAR ASS'N, STANDARDS FOR CRIMINAL JUSTICE, std. 3-5.8(c) (2d ed. 1980)). Argument that "exhorts the jury to send a message to society about the general problem of child sexual abuse" qualifies as such an improper emotional appeal. *State v. Bautista-Caldera*, 56 Wn. App. 186, 195, 783 P.2d 116 (1989) (emphasis omitted). We have similarly held that a prosecutor improperly appealed to passion and prejudice by arguing "that the jury should convict in order to protect the community [from drug dealing]." *State v. Ramos*, 164 Wn. App. 327, 338, 263 P.3d 1268 (2011) (discussing *United States v. Solivan*, 937 F.2d 1146 (6th Cir. 1991)).

Thierry contends that the prosecutor's statement that, if defense counsel's argument concerning JT's credibility "has any merit, . . . the State may as well just give up prosecuting [child sex abuse] cases, and the law might as well say that '[t]he word of a child is not enough'" also qualified as an improper appeal to passion and prejudice. 9 VRP at 16-17. Thierry relies heavily on *State v. Powell*, 62 Wn. App. 914, 816 P.2d 86 (1991), a child molestation case in which we held the following argument improper:

> [W]hat happens when we refuse to believe the children when we tell them, yes, if something happens you're supposed to tell? And then when they do, in fact, tell something has happened to them, what do we do? We don't believe them. We refuse to believe them. What does that tell the kids? . . . It tells them it's fine. Yeah. You can go ahead and tell, but don't expect us to do anything because if it's an adult, we're sure as heck going to believe the adult more than we believe the child. I mean, we know adults don't lie; but, yeah, we know kids lie in things of that sort. . . . Isn't that what we're telling them with regard to this? Are we . . . declaring open season on children to say: Hey, it's all right. You can go ahead and touch kids and everything.

*Powell*, 62 Wn. App. at 918 n.4. We held the resulting prejudice incurable and reversed, even though Powell had not requested a remedial instruction in the trial court. *Powell*, 62 Wn. App. at 919.

The argument here is similar to the prosecutor's improper arguments in *Powell* and *Bautista-Caldera*. The prosecutor's message was that if the jury did not believe JT's testimony, and thus by implication acquitted Thierry, "then the State may as well just give up prosecuting these cases, and the law might as well say that [t]he word of a child is not enough." 9 VRP at 16-17 (internal quotation marks omitted). The message, in other words, was that the jury needed to convict Thierry in order to allow reliance on the testimony of victims of child sex abuse and to protect future victims of such abuse. This hyperbole invited the jury to decide the case on an emotional basis, relying on a

10

threatened impact on other cases, or society in general, rather than on the merits of the State's case.

The State contends that the specific remarks to which Thierry objected "came in rebuttal and were directly in response to defense counsel's argument to remind the jury that the law does not require more than the word of a child as defense counsel was suggesting in her argument." Br. of Resp't at 15-16. The State further points out that the prosecutor did not explicitly ask the jury to render a guilty verdict in order to send anyone a message or correct some societal ill, and that she also accurately informed the jury that it should decide the case based on the court's instructions and the evidence presented.

The prosecutor, however, made similar statements in her initial closing remarks concerning the burden of proof and the difference between direct and circumstantial evidence, suggesting that this argument was not merely a response to Thierry's challenge to JT's credibility. More importantly, even if the prosecutor's argument was deemed purely a response to the defendant's argument, defense counsel never suggested that the jury should not believe JT because of his age. Nothing in defense counsel's closing argument, therefore, warranted the prosecutor's message that the State may as well give up prosecuting child sex abuse cases if JT were not believed and Thierry acquitted. Further, that the prosecutor did not explicitly call on the jury to send a message or to protect children does not make the argument any less improper. The implication is clear enough: were the jury to agree with defense counsel, they would put other children in danger. Other remarks that immediately preceded Thierry's objection, furthermore, made the "send a message" implication perfectly clear. 9 VRP at 16-17 ("How is it a good thing [to encourage children to report abuse] when basically the crux of [defense counsel's] argument is, 'They aren't going to be believed. . . . We can't believe what they say

11

because they make up stories,' so how is it a good thing to tell them that they should tell somebody because we're going to bring them in here to court to have a Defense attorney say, 'You can't believe them.'").

The prosecutor's argument was improper in the context presented. The question remains whether it posed a substantial likelihood of affecting the verdict.

B. The Misconduct Was Prejudicial

Thierry contends that the misconduct posed a risk of affecting the verdict sufficient to merit reversal. This is so, he argues, because the State's case relied almost entirely on JT's statements, which had not remained consistent and contradicted some of Sayfullah's testimony, and the prosecutor's argument invited the jury to credit JT's accusations for improper reasons. We agree.

As discussed, the *Powell* court held a similar argument so prejudicial as to be incurable by remedial instruction. 62 Wn. App. at 919. On the prejudice question, *Thorgerson* is also instructive. The *Thorgerson* court held improper a prosecutor's argument that "[t]he entire defense is sleight of hand" and "bogus" on the ground that it impugned the integrity of defense counsel. 172 Wn.2d at 450-51. The prosecutor made this argument in response to evidence the defense had presented that the defendant cared for his daughter, the alleged victim, which the prosecutor regarded as immaterial. *Thorgerson*, 172 Wn.2d at 450-51.

Although the court "conclude[d] that it was ill-intentioned misconduct," it declined to reverse, in part because the improper argument did not likely affect the outcome and because a curative instruction could have alleviated any prejudice.[6] *Thorgerson*, 172 Wn.2d at 452. In reaching this result, the court relied on the fact that "the victim's testimony was consistent

---

[6] Thorgerson did not object before the trial court. *Thorgerson*, 172 Wn.2d at 442.

throughout the trial and was consistent with what the witnesses testified she had told them before the trial, with one exception." *Thorgerson*, 172 Wn.2d at 452. The court also discussed the fact that the evidence that the prosecutor's improper argument encouraged the jury to disregard had at best marginal relevance in the case. *Thorgerson*, 172 Wn.2d at 452.

Here, Thierry did timely object, to no avail, so the efficacy of a curative instruction is not at issue. In contrast to *Thorgerson*, the prosecutor's improper argument went to the key issue in the case: whether the jury should believe JT's accusations. In further contrast, the inconsistencies among JT's statements, and between those statements and Sayfullah's testimony, open a realistic possibility that the jury may have disbelieved JT's accusations absent the improper argument.

In addition, by framing her remarks as a response to defense counsel's argument, the prosecutor misrepresented that argument in a way that exacerbated the prejudice flowing from the misconduct. The prosecutor described the "crux" of defense counsel's argument as follows: "Children can't be believed. . . . We can't believe what they say because they make up stories." 9 VRP at 16. She went on to assert that defense counsel "wants you to basically disregard everything that [JT] has said . . . because he's a child, because he was 8 when he said these things and because he was 9 when he was on the stand." 9 VRP at 17.

As noted, defense counsel never suggested that the jury should not believe JT because of his age. Thierry's attorney based her impeachment entirely on specific inconsistencies in JT's statements, possible motives to lie suggested by evidence in the record, and JT's testimony that he liked to write stories. Thierry's attorney certainly never argued, as the prosecutor claimed, that the jury should not credit JT's testimony simply "because he's a child." 9 VRP at 17.

The tactic of misrepresenting defense counsel's argument in rebuttal, effectively creating a straw man easily destroyed in the minds of the jury, does not comport with the prosecutor's duty to "seek convictions based only on probative evidence and sound reason." *Casteneda-Perez*, 61 Wn. App. at 363. "Because the jury will normally place great confidence in the faithful execution of the obligations of a prosecuting attorney, [a prosecutor's] improper insinuations or suggestions are apt to carry more weight against a defendant." *Solivan*, 937 F.2d at 1150.

The outcome of the case depended entirely on whether the jury chose to believe JT's accusations or Thierry's denial. The prosecutor's remarks created a substantial risk that the jury decided to credit JT's testimony for improper reasons. The prosecutor's remarks exacerbated that risk by misrepresenting defense counsel's argument so as to unfairly undermine Thierry's defense.

We hold that the improper argument to which Thierry timely objected requires reversal of his convictions. Resolving the prosecutorial misconduct claim on this ground, we decline to consider Thierry's other challenges to the prosecutor's closing argument.

CONCLUSION

The prosecutor's argument about JT's credibility was improper and had a substantial likelihood of affecting the verdict. Therefore, we reverse Thierry's convictions and remand for further proceedings.

A majority of the panel has determined that the remainder of this opinion lacks precedential value and will not be printed in the Washington Appellate Reports. The remainder of this opinion will be filed for public record in accord with RCW 2.06.040, and it is so ordered.

14

## II. THIERRY'S REMAINING CLAIMS

We decline to address Thierry's claims regarding certain conditions of community custody. Because the State largely concedes the impropriety of the challenged provisions, the issues appear unlikely to arise should Thierry be resentenced on remand.

We also decline to address the claims raised in Thierry's statement of additional grounds for review, which largely rely on matters outside the record or are too vague and conclusory to merit consideration. We note only that Thierry failed to preserve his challenge to Bradford's testimony regarding JT's trauma symptoms, as well as his claim that the trial court should have allowed him to present the testimony of Linesa, Lorrie's daughter.

According to *State v. Hamilton*, "[e]ven if a defendant objects to the introduction of evidence at trial, he or she 'may assign evidentiary error on appeal only on a specific ground made at trial.'" 179 Wn. App. 870, 878, 320 P.3d 142 (2014) (quoting *State v. Kirkman*, 159 Wn.2d 918, 926, 155 P.3d 125 (2007)). Thierry objected to Bradford's testimony generally on the ground that she did not qualify as an expert, not based on any specific ground involving the substance of the trauma testimony. We thus decline to reach the claim under RAP 2.5.

With respect to the testimony of Linesa, nothing in the record suggests that Thierry sought to offer it. "The purpose underlying issue preservation rules is to encourage the efficient use of judicial resources by ensuring that the trial court has the opportunity to correct any errors, thereby avoiding unnecessary appeals." *Hamilton*, 179 Wn. App. at 878. Thierry cannot now be heard to complain about the absence of a witness whose testimony he never sought to offer in the trial court. If Thierry alleges that he did seek to obtain Linesa's testimony,[7] the claim relies on

---

[7] The statement of additional grounds for review is ambiguous on this point. Statement of Additional Grounds at 3 ("I feel Lorrie Robinson's Daughter Linesa Robinson should have been able to testify in the case.").

matters outside the record. We decline to address it further. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995); RAP 2.5.

BJORGEN, J.

We concur:

JOHANSON, C.J.

SUTTON, J.