IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>　　　　　　Respondent,<br><br>　　v.<br><br>BARAKA ASABA,<br><br>　　　　　　Appellant. | No. 80236-4-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

SMITH, J. — Baraka Asaba and his codefendant were charged with first degree robbery. At trial, Asaba contended that the complaining witness did not accurately identify him as the robber. During her testimony at trial, the investigating detective misidentified Asaba based on photographs attached to an inadmissible e-mail exhibit. The prosecutor referenced and mischaracterized the e-mail exhibit and discussed reasonable doubt in a context not material to the issues at trial. The jury acquitted Asaba's codefendant but found Asaba guilty of second degree robbery. On appeal, Asaba contends that the prosecutor's statements constituted misconduct and deprived him of his right to a fair trial. While we agree that the prosecutor's comments were improper, Asaba failed to show prejudice. Accordingly, we conclude that the trial court did not err when it denied his motion for a mistrial, and we affirm his conviction.

FACTS

On May 15, 2017, at around 10:00 p.m., Nabil Madih met with a high

Citations and pin cites are based on the Westlaw online version of the cited material.

school acquaintance, Seid, at Seid's house.[1]  The two left Seid's house to meet with another former high school classmate, Abdou Darboe.  Seid asked Madih if he could drive Madih's car, and Madih agreed, although he found the request odd.  The two arrived across the street from Darboe's apartment in Lynnwood, Washington, and Darboe got into Madih's vehicle with Seid and Madih.  They listened to music, talked, and smoked marijuana.  Seid and Darboe suggested that the three of them meet with another classmate whom Madih did not recognize at first.  In showing Madih a Facebook profile of "Bongo Lion" to jar his memory, Madih recognized the profile as Asaba's, although he did not know his name.  Asaba had been Madih's peer in English class during high school.  Thus, Madih, who had graduated high school in 2014, had seen Asaba in class around four times per month for an hour and a half each time and for around three months.

When Madih expressed a desire to leave, Darboe and Seid insisted that they stay.  Eventually, two men arrived in an orange Infiniti SUV.  Madih testified that Asaba was in the driver's seat of the SUV.  Madih spoke with Asaba through the vehicles' windows.  Madih later testified that the man spoke as if he had been Madih's classmate and that he was one "hundred percent sure" that the SUV's driver was the person that he had English class with, i.e., Asaba.

Seid and Darboe exited Madih's vehicle and entered the back of the SUV.  Madih remained in the passenger seat of his vehicle.  Around 15 minutes later,

---

[1] Seid's first name is used throughout this opinion, consistent with the parties' briefs and references to him during trial.

Seid and Darboe got out of the SUV, and Seid returned to Madih's vehicle. Darboe returned to his apartment. Asaba thereafter exited the SUV and stood outside of Madih's passenger side window, next to Madih. The SUV's passenger (passenger) exited the vehicle and got into the back of Madih's car.

"[T]hey" asked for Madih's phone. Madih asked them, "[W]hy?" In response, the passenger and Asaba became aggressive and threatened to shoot Madih or steal his car. Madih believed the passenger had a gun because the passenger held his hand inside his jacket at his beltline. But Madih never saw a weapon. Asaba took Madih's wallet, discarding some cards back into the vehicle that he believed were expired. Asaba looked at Madih's identification and told Madih, "I know where you live, like don't think about going to the cops." The passenger and Asaba took Madih's vaporizer, phone, car keys, and wallet.

At this point, Madih told the passenger and Asaba to let him and Seid leave. Madih put the car into drive and told Seid to step on the gas. Seid drove around 20 feet but stopped. The passenger exited, and Madih and Seid drove away. Madih asked Seid to call 911, but Seid said that "he didn't want anything to do with it." Madih made Seid pull over at a gas station so that he could drive, and then Madih dropped off Seid at his home. Madih drove to the Mill Creek police station. An officer there told Madih that he needed to go to the Lynnwood police station, as the incident occurred in its jurisdiction. Madih drove to his sister's home and used her phone to call the Lynnwood police.

The Lynnwood police responded, and Madih recounted the events. At trial, Madih could not remember whether or not he told the responding officer that

he had smoked marijuana prior to the incident. After discussing the incident with the officer, Madih drove to the police station, where he gave Detective Jaqueline Arnett his initial statement. Madih identified Asaba as the individual who stood outside his window. However, he asked Darboe and Seid for photographs of the passenger. After receiving two photographs, Madih later testified that he believed that he had sent the photographs to Detective Arnett via e-mail.

At trial, Detective Arnett testified from memory that Madih had sent two images, one of Asaba and one of Ousman Faye. In response, the State introduced the e-mail exchange between Detective Arnett and Madih and the attached pictures to refresh Detective Arnett's recollection; the e-mails and pictures were not admitted as evidence. After reviewing the e-mails, Detective Arnett said that the e-mails included two photographs "of the same person," which she contended "look[ed] like Baraka Asaba." However, she reviewed the e-mails again and stated that "[t]he only subject [Madih] refers to in the emails is Mr. Darboe," concluding that the photographs must be of Darboe.

During Detective Arnett's investigation, Madih provided her with the Facebook profile for "Bongo Lion." Detective Arnett thereafter created a photo montage wherein she included a photograph of Asaba, whom she knew to be Bongo Lion. The second montage she created included a photograph of another individual who owned an orange Infiniti SUV. The final montage included a photograph of Faye. When shown the montages, Madih selected Asaba and Faye as the two individuals who had robbed him. Madih testified at trial that he was 100 percent sure that Asaba was the individual that stood at his window

4

because they had English class together.

Referencing exhibit 9, which was not admitted as evidence, defense counsel made the following statement during closing arguments:

> And so is it possible that Mr. Madih could have been looking [at] the picture shortly before he saw my client and shortly after and still confuse that it was actually my client who was there? I think you saw, during the trial, with your own eyes that it was. You saw Detective Arnett on the stand. You saw her looking at an email that was provided to her by Nabil. You saw her looking at two pictures and confidently saying that that person was Baraka Asaba.
>
> And you saw Mr. Hunter asking her, are you sure? Are you sure that's who that is? And you saw her looking. Does the content of the email in front of it give you any other indication of who that is? She's right there, pictures in front of her. And my client, Mr. Asaba, is standing -- sitting right here in front of her.
>
> Oh. Looking at the email, it appears that these are actually pictures of Abdou Darboe. So you can see how that works. How it works, that somebody can misidentify somebody even in those circumstances.

During rebuttal argument, the State argued:

> [PROSECUTOR:] With respect to Detective Arnett misidentifying the picture on the attached to the email exhibit that I was showing her, I suggest it's not so clear whether she misidentified the person or used the wrong name, but assume, since I've got the burden, that she misidentified the person -- you don't get to see in the picture that was attached to that email. You don't know how large or small it was, whether it was a photocopy of a fax of a photocopy, and so I'm just saying don't make assumptions on that point.
>
> . . . .
>
> [PROSECUTOR:] Lastly, I think I just want to give you one contrasting example with respect to reasonable doubt. There have been suggestions that Seid and Abdou set Nabil up, which also there are suggestions that somehow set the defendant up too. That's a good example of reasonable doubt. And you heard the evidence. Yeah, one of those guys, if not both, probably were in on this. But if I were standing here, asking you to convict them [with]

5

proof beyond a reasonable doubt --

[DEFENSE:] Objection, your Honor. This is an improper question, there is no testimony, they are not on trial, there was no investigation about this.

[THE COURT:] Overruled.

[PROSECUTOR:] I'm just saying, it's a good contrast between -- or it's a good example of reasonable doubt. Certainly nobody is going to convict those two with the information they have --

[DEFENSE:] I'm going to renew my objection, your Honor, I'm sorry.

[THE COURT:] Overruled.

[PROSECUTOR:] Even though just about everybody probably suspects they were setting him up.

So that's all I have to say. Again, thank you for your time and attention. I appreciate the work you will put into this, and I'm asking to you return guilty verdicts on both for first degree. Thank you.

The next day, Asaba moved for a mistrial as the jury continued to deliberate. Asaba argued that the inadmissible photographs attached to the e-mail were large and clear and, thus, the prosecutor's argument was untrue and improper. The trial court denied Asaba's motion.

During deliberations, the jury sent an inquiry to the court requesting to view the e-mails Madih had sent to Detective Arnett, "including photos." The court could not and did not provide the e-mails to the jury. The jury found Asaba guilty of the lesser included crime of second degree robbery. Asaba appeals.

ANALYSIS

Asaba contends that reversal is required due to prosecutorial misconduct. Although we agree with Asaba that the prosecutor's comments during trial were

6

improper, we conclude that those comments do not warrant reversal.

Prosecutorial misconduct may deprive a defendant of their guaranty to a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 22 of the Washington State Constitution. In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 703-04, 286 P.3d 673 (2012) (plurality opinion). To prevail on a prosecutorial misconduct claim, a defendant must first show that the prosecutor's statements were improper. State v. Emery, 174 Wn.2d 741, 759, 278 P.3d 653 (2012). "Once a defendant establishes that a prosecutor's statements are improper, we determine whether the defendant was prejudiced under one of two standards of review." Emery, 174 Wn.2d at 760. First, "[i]f the defendant objected at trial, the defendant must show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict." Emery, 174 Wn.2d at 760. A motion for a mistrial based on prosecutorial misconduct constitutes an objection and preserves the issue for appeal. State v. Lindsay, 180 Wn.2d 423, 430-31, 326 P.3d 125 (2014). We review claims of prosecutorial misconduct for an abuse of discretion because "[t]he trial judge is generally in the best position to determine whether the prosecutor's actions were improper and whether, under the circumstances, they were prejudicial." State v. Ish, 170 Wn.2d 189, 195-96, 241 P.3d 389 (2010).

Asaba contends that the prosecutor made two improper comments. We address each below.

*Reference to E-mail Exhibit*

Asaba first contends that the prosecutor committed misconduct when he referenced exhibit 9, the inadmissible exhibit containing photographs of Darboe. He asserts that the statement was improper because it was false and misleading, it interjected matters into the proceeding that were not probative of Asaba's guilt, and it vouched for Madih. We agree that the statement was improper but conclude that Asaba failed to show actual prejudice.

State v. Thorgerson, 172 Wn.2d 438, 258 P.3d 43 (2011), is instructive. There, Thorgerson challenged the prosecutor's statements during closing argument regarding what the victim had said to others and regarding how the hearsay rules prevented the State's production of those statements. Thorgerson, 172 Wn.2d at 445. Our Supreme Court determined that "the prosecutor's references to the victim having made additional out-of-court statements consistent with her in-court testimony, while advising the jury those statements were not admissible as evidence, *possibly* bolstered her credibility to some degree." Thorgerson, 172 Wn.2d at 447. It noted that it did not condone the prosecutor's comments. Thorgerson, 172 Wn.2d at 445. However, it concluded that in the context of the trial and because "the defense theory was the focus of the prosecutor's references," Thorgerson failed to show prejudice. Thorgerson, 172 Wn.2d at 450, 455.

Here, the prosecutor's statement regarding the e-mail exhibit was improper. The prosecutor stated, "[A]ssume, since I've got the burden, that she misidentified the person -- you don't get to see in the picture that was attached to

that email. You don't know how large or small it was, whether it was a photocopy of a fax of a photocopy." Like in Thorgerson, the prosecutor was referencing evidence that was inadmissible. And because the prosecutor knowingly mischaracterized the photographs as potentially unclear, we conclude that the statement was improper.

However, with regard to the prejudicial effect of the prosecutor's comment, the references to, and any mischaracterization of, the inadmissible evidence "did not provide any additional ground for finding the defendant guilty." Thorgerson, 172 Wn.2d at 450. Specifically, Detective Arnett's identification of Asaba did not decide Asaba's guilt; Madih's identification—which he provided in certain terms based off of his prior personal knowledge of Asaba from high school and not the pictures contained in the e-mail exhibits—did. Therefore, whether or not Detective Arnett misidentified Asaba did not provide additional grounds for finding Asaba guilty and did *not* provide direct support for Asaba's theory that Madih misidentified him. Also like in Thorgerson, the statement was in response to Asaba's reliance on Detective Arnett's misidentification. Accordingly, Asaba fails to show prejudice.

*Discussion of Seid, Darboe, and Reasonable Doubt*

Asaba next contends that the prosecutor committed misconduct when it compared the reasonable doubt associated with the theory that Seid and Darboe set up Madih to the reasonable doubt that Asaba robbed Madih. We agree that the statement was improper but conclude that Asaba failed to make a showing of prejudice.

9

In Emery, Anthony Marquise Emery Jr. and his codefendant, Aaron Edward Olson, appealed their convictions for, among other charges, first degree kidnapping and first degree robbery. 174 Wn.2d at 746. They contended that the prosecutor committed misconduct when it presented the jury with a "'fill in the blank'" statement with regard to reasonable doubt. Emery, 174 Wn.2d at 759. Specifically, the prosecutor told the jury that "'to find the defendant not guilty,'" it must fill in the blank with a reason why doubt exists. Emery, 174 Wn.2d at 759-60. The court concluded that the statement "subtly shift[ed] the burden [of proof] to the defense." Emery, 174 Wn.2d at 760. It nonetheless held that Emery and Olson failed to show prejudice. Emery, 174 Wn.2d 760-61.

Here, like in Emery, the prosecutor misstated the reasonable doubt standard; the prosecutor used an inappropriate comparison when, in discussing reasonable doubt, he interjected an argument regarding two individuals not on trial. Furthermore, the prosecutor potentially lessened the State's burden of proof. Specifically, by contending that there existed less doubt in the case of Asaba's guilt than in the case of Seid's or Darboe's, the prosecutor potentially conflated having less doubt with having proof beyond a reasonable doubt. Thus, the prosecutor's comparison was improper.

However, we cannot conclude that the trial court abused its discretion because there is not a substantial likelihood that the argument affected the jury's determination. In particular, the relevant evidence—i.e., the testimony of Madih—established that Asaba committed the crime, and Madih based his identification on his prior knowledge of Asaba. In addition, an instruction could

10

have cured this issue, and to that end, the court instructed the jury regarding the proper reasonable doubt standard. And we presume that juries "'follow instructions absent evidence to the contrary.'" State v. Lamar, 180 Wn.2d 576, 586, 327 P.3d 46 (2014) (quoting State v. Dye, 178 Wn.2d 541, 556, 309 P.3d 1192 (2013)). Accordingly, Asaba failed to show prejudice on his second theory of prosecutorial misconduct.

Asaba relies on State v. Thierry, 190 Wn. App. 680, 360 P.3d 940 (2015), for the proposition that "[c]reating straw man arguments does not comport with the prosecutor's duty to seek convictions based on probative evidence and sound reason." In Thierry, the prosecutor argued that if the jury accepted defense counsel's argument and did not believe the complaining witness, the State would be unable to prosecute child rape cases, and the jury would be "'declaring open season on children,'" allowing anyone to touch children inappropriately. 190 Wn. App. at 690-91 (quoting State v. Powell, 62 Wn. App. 914, 918 n.4, 816 P.2d 86 (1991)). On appeal, the court held that the prosecutor's statements were improper and "misrepresented [defense counsel's] argument in a way that exacerbated the prejudice flowing from the misconduct," and "created a substantial risk that the jury [would] credit [the victim's] testimony for improper reasons." Thierry, 190 Wn. App. at 692, 694. The court reversed Thierry's conviction on this basis. Thierry, 190 Wn. App. at 695. Here, the prosecutor's comments did not pose a similar risk of inflaming the jury against Asaba. Accordingly, Thierry does not control.

Because Asaba failed to establish that either instance of the prosecutor's

improper conduct affected the outcome of trial, we do not apply a cumulative error analysis.  See, e.g., Thorgerson, 172 Wn.2d at 442-44, 454 (reviewing multiple claims of prosecutorial misconduct individually and, despite finding some improper, declining to apply the cumulative error doctrine).

We affirm.

_____

WE CONCUR:

_____   _____