FILED
APRIL 18, 2017
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 34972-1-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| NORMAN RAY GOODRUM, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Norman Goodrum appeals his convictions for first

degree robbery, second degree burglary, and third degree theft. He argues insufficient

evidence supports his second degree burglary conviction because the State failed to prove

he "entered or remained unlawfully" in a building. He also argues the prosecutor

committed misconduct in rebuttal argument by shifting the burden of proof and by

arguing facts not in evidence. Finally, he contends the trial court erred in imposing legal

financial obligations (LFOs) without inquiring into his ability to pay. In a statement of

additional grounds for review (SAG), Mr. Goodrum claims he received ineffective

assistance of counsel, alleges additional instances of prosecutorial misconduct, and argues

cumulative error deprived him of a fair trial. We disagree with Mr. Goodrum's

arguments and affirm.

FACTS

On February 27, 2015, Mr. Goodrum rented a room at the Travelodge hotel in Longview, Washington. When Mr. Goodrum returned to the hotel office, he and the front desk manager, Brandon Excell, began arguing about Mr. Goodrum's damage deposit. The two argued for 30 minutes, and Mr. Excell eventually returned Mr. Goodrum's deposit to end the argument.

On March 6, Mr. Excell was again managing the front desk at the Travelodge. At around 6:30 p.m., Mr. Excell received a telephone call from Sharon Hockett in room 111. Mr. Goodrum was in the room and had broken the toilet, so Ms. Hockett asked Mr. Excell to come fix it. Mr. Excell left the office to go fix the toilet. Mr. Excell thought he would only be gone for a short time, so he did not lock the door.

Shortly after the telephone call, surveillance video showed a man walk out of room 111 and ride away on a bicycle. In the video, the man was wearing a black and gray Fox-brand sweatshirt, jeans, and black and white Nike shoes.

Moments later, Mr. Excell arrived at room 111 and knocked on the door. Only Ms. Hockett was there. Mr. Excell looked inside the toilet tank and saw the chain between the handle and the flapper had been disconnected. Mr. Excell hooked the chain back up.

As Mr. Excell was fixing the toilet, a person in a black and gray Fox sweatshirt, jeans, and black and white Nike shoes entered the Travelodge office. The person had the hood pulled over his or her head. The person approached the front desk, which was "L" shaped and faced the corner of the room. The person walked behind the front desk area, bent over behind the counter, and used a crowbar to pry open one of the drawers. The person took a stack of cash from inside the drawer and walked out of the office.

On March 18, Mr. Excell was again managing the front desk at the Travelodge. Around 9:30 p.m., a masked person wearing a black and gray Fox sweatshirt and black and white Nike shoes walked in the door. The person pointed a handgun at Mr. Excell and told him to hand over the money in the drawer. The robber's voice sounded familiar to Mr. Excell, but he was unable to place it. Mr. Excell took the money from the drawer and gave it to the person.

Mr. Excell thought about the incident over the next week and realized he recognized the robber's voice from his earlier argument with Mr. Goodrum. Officer Steve Dennis interviewed Mr. Goodrum. Another officer showed Mr. Goodrum a picture from the March 6 surveillance video of the person outside room 111 wearing the black and gray Fox sweatshirt. Mr. Goodrum admitted the person in the picture was him. The police later obtained a search warrant and searched Mr. Goodrum's home. They found a

used gun cleaning kit in Mr. Goodrum's bedroom. They also found Nike shoes and a black and gray Fox sweatshirt in the house.

The State charged Mr. Goodrum with first degree robbery, second degree burglary, and third degree theft. At trial, the State played the Travelodge's surveillance videos for the jury, which showed the incidents on March 6 and March 18.

In closing argument, the prosecutor noted the central question in the case was whether Mr. Goodrum was the person in the surveillance videos. The prosecutor argued it was Mr. Goodrum who burglarized the Travelodge on March 6 because Mr. Goodrum later admitted he was outside room 111 that night, and the person who took the cash from the drawer two minutes later was wearing the same exact clothing as Mr. Goodrum. The prosecutor also argued it was Mr. Goodrum who robbed the Travelodge on March 18 because the robber again wore the same clothing and the police found a used gun cleaning kit in Mr. Goodrum's house, which suggested Mr. Goodrum previously had a gun.

In the defense's closing argument, defense counsel implied Mr. Excell and Ms. Hockett could have framed Mr. Goodrum. Defense counsel argued Mr. Excell could have used his knowledge of the Travelodge surveillance system to make it appear Mr. Goodrum was responsible for the crimes. Defense counsel suggested Mr. Excell may have done this to retaliate against Mr. Goodrum for their argument over the damage

deposit. Defense counsel also argued Ms. Hockett, who was a drug addict and desperate for money, could have conspired with another unknown person.

In rebuttal, the prosecutor argued it was unlikely that Mr. Excell and Ms. Hockett framed Mr. Goodrum twice. The prosecutor later asked the jury to conclude Mr. Goodrum was the burglar based on the physical evidence. He then stated, "There is no other explanation, there is no reasonable doubt." Report of Proceedings (RP) (Aug. 12, 2015) at 127.

The prosecutor then re-outlined the evidence supporting the robbery charge. He then stated, "There's a gun case for a gun that's never located but was seen during the robbery, we see a gun. Mr. Goodrum has the—has a gun case." RP (Aug. 12, 2015) at 130. The prosecutor then concluded that Mr. Excell and Ms. Hockett did not know each other, and there was "no evidence of any other suspects for the robbery." RP (Aug. 12, 2015) at 131. Defense counsel did not object to any of these statements.

The jury found Mr. Goodrum guilty as charged. At sentencing, the trial court imposed a $500 victim assessment but struck all other fees and costs. Mr. Goodrum did not object to the imposition of the victim assessment. Mr. Goodrum appeals.

5

## ANALYSIS

A.  SUFFICIENCY OF THE EVIDENCE FOR SECOND DEGREE BURGLARY

Mr. Goodrum argues insufficient evidence supports his conviction for second degree burglary because the State failed to prove he entered or remained unlawfully in the building.  He argues the Travelodge hotel office was unlocked, open to the public, and no one ever revoked his license to be there.  Therefore, he argues, even if he intended to commit a crime, his presence in the building was lawful.

When a defendant challenges the sufficiency of the evidence, the proper inquiry is "whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).  "[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." *Id.*

A person commits second degree burglary "if, with intent to commit a crime against a person or property therein, he or she enters or remains unlawfully in a building other than a vehicle or a dwelling." RCW 9A.52.030(1).  A person unlawfully enters or remains in a building when he or she is not licensed, invited, or otherwise privileged to enter or remain.  Former RCW 9A.52.010(5) (2011).

6

"A license or privilege to enter or remain in a building which is only partly open to the public is not a license or privilege to enter or remain in that part of a building which is not open to the public." *Id.* Thus, a person still commits second degree burglary when he or she initially enters a building lawfully, but then exceeds the scope of the implied or express privilege by intruding into areas of the building not open to the public. *State v. Allen*, 127 Wn. App. 125, 135, 110 P.3d 849 (2005). A trier of fact may infer limitations on the scope of a person's privilege to be on the premises from the particular facts of the case. *State v. Collins*, 110 Wn.2d 253, 261-62, 751 P.2d 837 (1988).

For example, in *Allen*, the manager of a U.S. Bank branch—which was located on the first floor of a high rise office building open to the public—saw Joel Allen walk out of his personal office. *Allen*, 127 Wn. App. at 128. The manager went to his office and discovered his wallet was missing. *Id.* The manager later saw Mr. Allen out on the street, confronted him, and held him until police arrived. *Id.* at 128-29. The State charged Mr. Allen with second degree burglary. *Id.* at 127.

The *Allen* court reversed Mr. Allen's convictions on other grounds, but nevertheless held sufficient evidence supported his burglary conviction. *Id.* at 137. The court acknowledged the office building was open to the public and, therefore, Mr. Allen was initially privileged to enter. *Id.* However, the court noted Mr. Allen exceeded that

7

privilege when he entered the manager's office, which was physically separated from the lobby and teller areas by a partial wall and a portion of the escalator. *Id.* at 138. The court also noted the manager placed some chairs to create a narrow opening into his office, which supported a reasonable inference that the office was not part of the public area of the bank and that Mr. Allen exceeded the scope of any privilege by entering the office. *Id.*

Here, the Travelodge office was unlocked and open to the public, and thus Mr. Goodrum was initially privileged to enter. But as the surveillance video shows, the front desk—which was in an "L" shape and facing the corner of the office—was plainly reserved for Travelodge employees. Much like the chairs that left a narrow opening to the manager's office in *Allen*, the narrow pathway leading behind the Travelodge front desk supports a reasonable inference that this area was not part of the public area of the office. Because Mr. Goodrum intruded into an area that was not open to the public, he exceeded the scope of the implied privilege to be in the office.

Drawing all reasonable inferences in favor of the State, we conclude the evidence was sufficient for a rational jury to find that Mr. Goodrum remained in the office unlawfully. Accordingly, sufficient evidence supports his conviction for second degree burglary.

B.      PROSECUTOR'S COMMENTS IN REBUTTAL ARGUMENT

Mr. Goodrum argues the prosecutor committed misconduct during rebuttal by shifting the burden of proof to him to prove his innocence. He also contends the prosecutor improperly argued facts not in evidence.

The prosecutorial misconduct inquiry consists of two prongs: first, whether the prosecutor's comments were improper and, if so, whether the improper comments caused prejudice. *State v. Lindsay*, 180 Wn.2d 423, 430, 326 P.3d 125 (2014). However, when the defendant fails to object to the prosecutor's conduct or request a curative instruction at trial—as is the case here—the misconduct is reversible error only if the defendant shows the misconduct was so flagrant and ill-intentioned that an instruction could not have cured the resulting prejudice. *Id.*

In the context of closing arguments, the prosecutor has "'wide latitude in making arguments to the jury and prosecutors are allowed to draw reasonable inferences from the evidence.'" *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009) (quoting *State v. Gregory*, 158 Wn.2d 759, 860, 147 P.3d 1201 (2006)). This court considers a prosecutor's alleged improper conduct in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the jury instructions. *State v. Anderson*, 153 Wn. App. 417, 430, 220 P.3d 1273 (2009).

9

1. *Alleged burden shifting*

Mr. Goodrum argues several of the prosecutor's statements in rebuttal argument shifted the burden of proof to the defense. He argues the remarks suggested he was guilty because there was no evidence to prove his innocence.

The prosecutor may not shift the burden of proof to the defendant. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 713, 286 P.3d 673 (2012). Because the defendant has no duty to present evidence, it may be misconduct for a prosecutor to argue that the defense did not call witnesses or explain the factual basis of the charges. *Anderson*, 153 Wn. App. at 428; *State v. Jackson*, 150 Wn. App. 877, 885, 209 P.3d 553 (2009); *see also State v. Blair*, 117 Wn.2d 479, 485-92, 816 P.2d 718 (1991) (holding a prosecutor may comment on defendant's failure to call particular witnesses under the missing witness doctrine). A prosecutor may not imply that a defendant is guilty because he or she failed to explain the State's evidence. *State v. Fleming*, 83 Wn. App. 209, 215, 921 P.2d 1076 (1996).

For example, in *Fleming*, the prosecutor argued in closing that "'you . . . would expect and hope that if the defendants are suggesting there is a reasonable doubt, they would explain some fundamental evidence in this [matter]. And several things, they never explained.'" *Id.* at 214 (emphasis omitted) (alterations in original). The prosecutor

then argued the defendants had not explained several pieces of the State's evidence, such as how the alleged rape victim got scratched. *Id.* at 214-15. The prosecutor implied the defendants had a duty to explain this evidence and, because they did not, they were guilty. *Id.* at 215.

However, it is not misconduct for a prosecutor to argue that the evidence does not support the defense theory. *Lindsay*, 180 Wn.2d at 431; *State v. Russell*, 125 Wn.2d 24, 87, 882 P.2d 747 (1994). The prosecutor, as an advocate, is entitled to make a fair response to the arguments of defense counsel. *Russell*, 125 Wn.2d at 87. Even if a prosecutor's response is improper, this court will not reverse if the remarks were invited or provoked by defense counsel, in reply to defense counsel's argument, pertinent, and not incurably prejudicial. *Id.* at 86; *State v. Thierry*, 190 Wn. App. 680, 690, 360 P.3d 940 (2015), *review denied*, 185 Wn.2d 1015, 368 P.3d 171 (2016).

Here, defense counsel implied Mr. Excell and Ms. Hockett could have framed Mr. Goodrum, argued they both had motive to do so, and implied an unknown third person could have helped. In rebuttal, the prosecutor responded that such a conspiracy was unlikely, and then later re-outlined the evidence supporting the burglary charge:

> We know that the guy outside 111 in the beginning is the Defendant. We know because he told you. And we know, based on the physical evidence, that it was the Defendant that burgled the place two minutes later. *There is no other explanation, there is no reasonable doubt.*

11

No. 34972-1-III
*State v. Goodrum*

RP (Aug. 12, 2015) at 127 (emphasis added).

Mr. Goodrum argues the italicized remarks improperly shifted the burden of proof. We disagree. The prosecutor did not imply Mr. Goodrum had a duty to explain the State's evidence for the jury to acquit him. Rather, the prosecutor summarized the State's evidence and argued that, in light of this evidence, there was no other explanation for the crime. These comments were not improper.

The prosecutor concluded rebuttal by arguing:

> There's no evidence here that says . . . Excell knew Hockett. I mean, there's just nothing. They—she said he didn't know her; he said she didn't know him. They'd seen each other, but that's it. There's no evidence, *and there's no evidence of any other suspects for the robbery*.

RP (Aug. 12, 2015) at 130-31 (emphasis added).

Mr. Goodrum argues the italicized remarks also improperly shifted the burden of proof. Again, we disagree. Defense counsel argued in closing that another unknown suspect could have conspired with Mr. Excell and Ms. Hockett to frame Mr. Goodrum. The prosecutor was entitled to respond to this argument and argue the evidence did not support this theory. The fact the prosecutor did not make similar statements in his initial closing argument further demonstrates these remarks in rebuttal were merely a response

12

to the defense theory. *See Thierry*, 190 Wn. App. at 692. Accordingly, these comments were not improper.[1]

### 2.    *Alleged reference to facts not in evidence*

Mr. Goodrum also contends the prosecutor improperly argued facts not in evidence. He cites the prosecutor's reference to a "gun 'case,'" which the prosecutor argued he possessed. Br. of Appellant at 21. He argues there was no evidence of a gun case at trial.

It is improper for a prosecutor during closing argument to make statements or submit to the jury facts that are not supported by the evidence. *Glasmann*, 175 Wn.2d at 704-05; *State v. Boehning*, 127 Wn. App. 511, 519, 111 P.3d 899 (2005).

During trial, the State called a police officer who testified he found a used gun cleaning kit in Mr. Goodrum's bedroom. The prosecutor argued in his initial closing argument that this cleaning kit suggested Mr. Goodrum previously had a gun. The prosecutor attempted to make this same reference during rebuttal argument, but called it a "gun case" instead of a "gun cleaning kit." RP (Aug. 12, 2015) at 130. Although the remark was a misstatement of the evidence, it was likely an unintentional misstatement.

---

[1] Mr. Goodrum also cites the prosecutor's statement that Mr. Goodrum "should probably 'buy a lottery ticket because he's used up a lifetime of bad luck to get all of these coincidences.'" Br. of Appellant at 20. However, Mr. Goodrum does not explain

Had defense counsel objected, the prosecutor could have easily corrected the misstatement. This isolated misstatement does not warrant reversal.

### 3. *Ineffective assistance of counsel*

Mr. Goodrum also argues defense counsel provided ineffective assistance because he did not object to these comments or request a curative instruction. To succeed on an ineffective assistance claim, the defendant must show both deficient performance and a reasonable probability the attorney's conduct affected the case's outcome. *State v. Benn*, 120 Wn.2d 631, 663, 845 P.2d 289 (1993).

Because the prosecutor did not shift the burden of proof to the defense, his remarks were not improper and defense counsel did not perform deficiently by not objecting. *See State v. Larios-Lopez*, 156 Wn. App. 257, 262, 233 P.3d 899 (2010).

Even assuming defense counsel's failure to object to the prosecutor's "gun case" remark was deficient, Mr. Goodrum fails to show prejudice. The jury was likely aware the prosecutor was attempting to reiterate the same point from his initial closing argument about the gun cleaning kit. There is no evidence the jury interpreted the "gun case" statement as anything other than a simple misstatement. Mr. Goodrum's ineffective assistance claim fails.

---

how this comment shifted the burden of proof.

14

C.     ALLEGED LFO ERROR

Mr. Goodrum argues the trial court erred in imposing the $500 victim assessment without considering his ability to pay. He also argues the court erred because it did not make any specific findings about his financial situation.

Mr. Goodrum did not object to the imposition of this LFO at the sentencing hearing. He is, therefore, not entitled to appellate review as a matter of right. *See State v. Blazina*, 182 Wn.2d 827, 832-35, 344 P.3d 680 (2015). But even assuming he had preserved the issue, his claim is meritless.

RCW 10.01.160(3) only requires the trial court to inquire into a defendant's ability to pay before it imposes *discretionary* LFOs. *E.g., State v. Shelton*, 194 Wn. App. 660, 673, 378 P.3d 230 (2016), *review denied*, 187 Wn.2d 1002, 386 P.3d 1088 (2017). The $500 victim assessment is mandatory, and trial courts must impose it regardless of a defendant's ability to pay. *See, e.g., State v. Curry*, 118 Wn.2d 911, 917-18, 829 P.2d 166 (1992); *State v. Mathers*, 193 Wn. App. 913, 922-24, 376 P.3d 1163, *review denied*, 186 Wn.2d 1015, 380 P.3d 482 (2016); *Shelton*, 194 Wn. App. at 673-74. Because the trial court only imposed mandatory LFOs, it was not required to consider Mr. Goodrum's

ability to pay, nor was it required to make findings about his financial situation.[2]

## D. APPELLATE COSTS

Mr. Goodrum argues that this court should not presumptively impose appellate costs against indigent defendants who lose on appeal and then require those defendants to rebut that presumption. He also argues this court "cannot impose costs on appeal unless it considered the appellant's actual ability to pay." Br. of Appellant at 34.

An appellate court has discretion to require a convicted defendant to pay appellate costs to the State. *See* RCW 10.73.160(1); RAP 14.2. Generally, "the party that substantially prevails on review" will be awarded appellate costs, unless the court directs otherwise in its decision terminating review.[3] RAP 14.2. An appellate court's authority

---

[2] Trial courts are not required to enter formal findings regarding a defendant's ability to pay court costs. *See Curry*, 118 Wn.2d at 914-16. Citing *State v. Duncan*, 185 Wn.2d 430, 374 P.3d 83 (2016), Mr. Goodrum appears to argue that trial courts are required to make findings regarding a defendant's ability to pay before imposing mandatory LFOs. The only relevant portion of *Duncan* is where the court states "[t]he constitution does not require that the trial court enter formal findings, though of course it is a good practice and helpful on review." *Id.* at 436-37. *Duncan* does not help Mr. Goodrum because (1) it still does not *require* findings, and (2) Mr. Goodrum is not asserting a constitutional claim that he is being sanctioned for nonwillful failure to pay, but a statutory claim that the trial court violated RCW 10.01.160(3) in imposing the LFO.

[3] "A 'prevailing party' is any party that receives some judgment in its favor." *Guillen v. Contreras*, 169 Wn.2d 769, 775, 238 P.3d 1168 (2010). "If neither party completely prevails, the court must decide which, if either, substantially prevailed." *Id.* Here, the State is the substantially prevailing party.

to award costs is "permissive," and a court may, pursuant to RAP 14.2, decline to award costs at all. *See State v. Nolan*, 141 Wn.2d 620, 628, 8 P.3d 300 (2000).

Unlike RCW 10.01.160(3), which was at issue in *Blazina*, 182 Wn.2d 827, the statute authorizing appellate costs does not require an inquiry into the defendant's financial resources before appellate costs are imposed. *See* RCW 10.73.160; *State v. Sinclair*, 192 Wn. App. 380, 389, 367 P.3d 612, *review denied*, 185 Wn.2d 1034, 377 P.3d 733 (2016) (noting that while ability to pay is an important factor that may be considered under RCW 10.73.160, it is not necessarily the only relevant factor, nor is it necessarily an indispensable factor); *State v. Wright*, 97 Wn. App. 382, 384, 985 P.2d 411 (1999) (finding that RCW 10.73.160 only requires an inquiry into ability to pay at the point of collection and not when the recoupment order is made).

Because this court's authority to award appellate costs is permissive and discretionary, this court does not *presumptively* impose appellate costs against defendants. Rather, the court determines which party substantially prevailed, considers the appropriate factors, and exercises its discretion.

Mr. Goodrum also argues that this court may not constitutionally impose appellate costs unless it considers the appellant's actual ability to pay. Our Supreme Court expressly rejected this argument in *State v. Blank*, 131 Wn.2d 230, 930 P.2d 1213 (1997).

17

There, the court considered "whether, *prior* to including a repayment obligation in defendant's judgment and sentence, it is constitutionally necessary that there be an inquiry into the defendant's ability to pay, his or her financial resources, and whether there is no likelihood that defendant's indigency will end." *Id.* at 239. The *Blank* court held the constitution does not require an inquiry into ability to pay at the time the costs are imposed. *Id.* at 242. "Instead, the relevant time is the point of collection and when sanctions are sought for nonpayment." *Id.* "If at that time defendant is unable to pay through no fault of his own, . . . constitutional fairness principles are implicated." *Id.*

Because Mr. Goodrum is not yet faced with the alternatives of payment or imprisonment, his constitutional objection to appellate costs on the grounds of indigency is premature. Mr. Goodrum acknowledges *Blank*, but argues our Supreme Court cast doubt on *Blank*'s continuing validity when it decided *Blazina*, 182 Wn.2d 827. However, our Supreme Court decided *Blazina* solely on statutory grounds. *See id.* at 839. *Blazina* has no bearing on the constitutionality of Washington's appellate cost scheme.

18

Under ordinary circumstances, Division Three's June 2016 "General Order" would dictate the outcome of Mr. Goodrum's request to deny the State appellate costs.[4] However, this case was originally assigned to Division Two. It was transferred to this division pursuant to RCW 2.06.040, RAP 4.4, and CAR 21(a) after briefing was complete.[5] Because the Division Three General Order sets forth various requirements and deadlines for criminal appellants *during* the briefing process, we decline to require Mr. Goodrum to strictly comply with the General Order.

Division Two of this court generally exercises its discretion to waive appellate costs when the trial court has previously found the defendant indigent, reasoning that under RAP 15.2(f), appellate courts presume a defendant's indigence throughout review unless the court finds the defendant's financial situation has improved. *E.g., State v. Hart*, 195 Wn. App. 449, 463, 381 P.3d 142 (2016), *review denied*, 187 Wn.2d 1011, 388

---

[4] The General Order directs defendants who want this court to exercise its discretion not to impose appellate costs to make their requests either in their opening briefs or in a RAP 17 motion, which must be filed within 60 days after the defendant's opening brief. If a defendant alleges inability to pay as a factor supporting his or her request, the order also requires the defendant to designate evidence relating to the trial court's determination of indigency and the defendant's current or likely ability to pay discretionary LFOs. It also requires defendants to file a report as to continued indigency with this court no later than 60 days after they file their opening briefs.

[5] These provisions are all silent as to whether the transferee division may apply its own general orders to the transferred cases.

19

P.3d 480 (2017). Here, the trial court found Mr. Goodrum indigent for purposes of

appeal. Because the parties had no control over the fact this case was transferred to

Division Three, we exercise our discretion consistent with Division Two's policy and

waive appellate costs in this matter.

### STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW

A defendant is permitted to file a pro se SAG in a criminal case on direct appeal.

RAP 10.10(a). This statement is not required to cite authorities or to the record itself, but

must have sufficient specificity to inform the court of the "nature and occurrence" of

specified errors. RAP 10.10(c). The SAG must not rely on matters outside the record.

*State v. McFarland*, 127 Wn.2d 322, 338, 899 P.2d 1251 (1995).

In his SAG, Mr. Goodrum argues he received ineffective assistance of counsel,

alleged additional instances of prosecutorial misconduct, and argues cumulative error

deprived him of a fair trial.

A.     INEFFECTIVE ASSISTANCE OF COUNSEL

Mr. Goodrum first argues he received ineffective assistance because trial counsel

failed to call additional witnesses to support his alibi defense. However, there is nothing

in the record on appeal regarding what information these unknown witnesses could have

supplied, whether they would have testified, if counsel knew about them, and if he did,

20

why he declined to call them.[6] Because the record is inadequate to determine whether trial counsel's failure to call these witnesses was deficient or prejudicial, this court cannot consider this issue on direct review. *See McFarland*, 127 Wn.2d at 337-38. The appropriate means of raising this issue is through a personal restraint petition. *Id.* at 335.

Mr. Goodrum also argues he received ineffective assistance because trial counsel was unable to operate the courtroom audio-visual equipment. He argues this affected counsel's ability to argue he was not the same height as the burglar or robber. The record demonstrates trial counsel had some initial trouble with the courtroom audio-visual equipment, but was eventually able to operate it after the prosecutor assisted him. *See* RP (Aug. 12, 2015) at 117-18.

Mr. Goodrum also argues trial counsel failed to adequately address the fact Ms. Hockett used heroin prior to testifying. Ms. Hockett testified she had been an addict for eight or nine years, had used heroin earlier that day, and if she had not used heroin she would have been sick and would have been "no good" as a witness. RP (Aug. 12, 2015) at 22. The prosecutor asked if she had any trouble focusing, and Ms. Hockett responded she was nervous but it had nothing to do with her heroin use. Rather than focusing his

---

[6] Mr. Goodrum names his mother as one of these potential witnesses, but does not specify who the others are.

cross-examination on Ms. Hockett's drug use that day, defense counsel instead focused on whether Ms. Hockett remembered what happened on March 6. This was not deficient performance.

Finally, Mr. Goodrum argues he received ineffective assistance because trial counsel failed to address the fact that Mr. Excell recognized the robber's voice from his earlier argument with Mr. Goodrum. But because this was particularly unfavorable evidence to Mr. Goodrum, trial counsel may have not wanted to highlight it. *See Benn*, 120 Wn.2d at 665 (defense counsel does not perform deficiently if his or her trial conduct can be characterized as legitimate trial strategy or tactic).

We conclude Mr. Goodrum did not receive ineffective assistance of counsel.

B.    PROSECUTORIAL MISCONDUCT

Mr. Goodrum argues the prosecutor committed misconduct by vouching for Ms. Hockett's credibility in closing argument. A prosecutor cannot express a personal opinion as to a defendant's guilt or a witness's credibility, independent of the evidence actually in the case. *Lindsay*, 180 Wn.2d at 437; *Glasmann*, 175 Wn.2d at 706. But a prosecutor may draw inferences from the evidence as to why the jury would want to believe one witness over another. *State v. Brett*, 126 Wn.2d 136, 175, 892 P.2d 29 (1995).

22

In summarizing the evidence, the prosecutor referenced Ms. Hockett's testimony that Mr. Goodrum was in room 111 on March 6. The prosecutor then stated, "[I]t's up to [the jury] to decide if she was telling the truth." RP (Aug. 12, 2015) at 109. The prosecutor then implied Ms. Hockett's testimony was believable because she had testified about some embarrassing information. This was not improper. The prosecutor correctly informed the jury that its role was to determine whether Ms. Hockett testified truthfully, and then drew an inference from the evidence as to why the jury should believe her.

Mr. Goodrum also contends the prosecutor misstated the facts when he argued that Mr. Goodrum confessed to the crime. However, the prosecutor did not argue Mr. Goodrum confessed to the *crime*. Rather, the prosecutor's remarks referenced Mr. Goodrum's admission to Officer Steve Dennis that he was the individual in the black and gray Fox sweatshirt outside room 111 on March 6. *See* RP (Aug. 11, 2015) at 151; RP (Aug. 12, 2015) at 99, 110.

Mr. Goodrum also contends the prosecutor misstated the facts when he argued that Mr. Goodrum broke the toilet in room 111. However, Officer Dennis testified that Mr. Goodrum admitted he broke the toilet. *See* RP (Aug. 11, 2015) at 151.

23

Mr. Goodrum finally contends the prosecutor committed misconduct when he argued the Nike shoes the police found in Mr. Goodrum's house were the same shoes from the surveillance videos, when they were actually different shoes. This was not the prosecutor's argument. Rather, the prosecutor, who was playing the video footage for the jury, argued the shoes Mr. Goodrum wore outside room 111 matched the burglar's shoes, and these also matched the robber's shoes. *See* RP (Aug. 12, 2015) at 101, 106, 109.

C.    CUMULATIVE ERROR

Mr. Goodrum argues his conviction should be reversed based on cumulative error. The cumulative error doctrine applies if there were several trial errors, none of which standing alone is sufficient to warrant reversal, that when combined may have denied the defendant a fair trial. *State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). Here, there were not multiple errors and, therefore, there was no cumulative error.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Lawrence-Berrey, J.

24

No. 34972-1-III
*State v. Goodrum*

WE CONCUR:


_____          _____
Fearing, C.J.                        Korsmo, J.

25