IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>REUBEN TALOZA MELEGRITO,<br><br>Appellant. | No. 80454-5-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

SMITH, J. — Reuben Melegrito shot two men, one of whom later died from complications caused by his injuries. Following an investigation into the murders, the State charged Melegrito with murder in the second degree and attempted murder in the second degree, both with firearm enhancements. At trial, Melegrito claimed that he shot both men in self-defense. The jury did not accept Melegrito's defense and found him guilty on both counts. Melegrito appeals, alleging numerous errors, including errors in jury selection, the admission of the State's demonstrative evidence and Melegrito's flight from the scene of the crime and the officers, the validity of the court sending the jury back to correct a blank special verdict form, and his offender score at sentencing.

Because we conclude that the trial court did not err or that the alleged errors did not prejudice Melegrito, we affirm.

FACTS

The parties dispute the facts surrounding the shooting of John Bacani and Mark Gallardo. Melegrito contends that he shot the victims in self-defense. The

State's witnesses, including Gallardo, testified to the contrary.

Shortly before 4:00 p.m. on November 2, 2016, Melegrito showed up at Gallardo's house unannounced. Melegrito testified that he often showed up to Gallardo's house unexpectedly. Krysta Kauk, Gallardo's girlfriend at the time, came out and told Melegrito that Gallardo was not home. Melegrito parked his car on the street and waited for him. Shortly thereafter, Gallardo returned with Bacani.

According to Melegrito, the three men spoke on the porch, and Kauk joined them outside where they smoked cigarettes. Eventually, Kauk and Gallardo went back inside. After about 10 minutes, Gallardo came back out onto the porch and "was looking kind of mad." Melegrito testified that they walked from the porch toward Bacani's and Gallardo's vehicles located in the driveway, planning to drive to someone's house. Melegrito trailed Gallardo and Bacani. Melegrito testified:

> John g[a]ve me a cigarette, so we smoked again. And then Mark was just messing with the Honda. That's when -- I don't know if he went in front of -- to pop the hood, but he went all the way over here, and to me, he went to go grab -- you know, he went to go grab his gun or something.

Specifically, Melegrito testified that Gallardo started "grabbing stuff" from the passenger's side of the car but that he could not see "what [Gallardo] grabbed in there."

Melegrito testified that once Gallardo popped the hood of his vehicle, he called Bacani over. Then Melegrito alleged that they were "talking and whispering," and he started to "trip out." At this point, he believed that Gallardo

passed Bacani a gun. According to Melegrito, Gallardo got into the vehicle. Melegrito was watching Gallardo, but he turned around and saw Bacani reach his right hand "into his pocket," so Melegrito "pulled [his] gun out." Melegrito alleged that he knew Gallardo and Bacani carried guns, that he had seen Gallardo carrying a gun, and that Bacani had previously shown him his gun. He asserted that when he turned, he "was scared," and he shot from his waist at Bacani, first, and then Gallardo. Melegrito shot Gallardo four times and Bacani twice, which he contended was "just a reflex." He told the jury, "I didn't want to die."

Gallardo, on the other hand, testified that he did not expect Melegrito to show up at his home and that, at one point during their conversations, Melegrito asked Gallardo, "[W]here's your gun at," to which Gallardo responded that he did not have it. Gallardo and Bacani had agreed to go to a friend's home and drive separately, so they exited the house. Gallardo testified that the three men and Kauk went outside to smoke cigarettes.

After they were done, Kauk went back inside the home, and Gallardo and Bacani began walking to their vehicles to go to their friend's house. Gallardo and Bacani told Melegrito that he could not accompany them, which Melegrito resisted. Gallardo testified that, as he and Bacani walked to their respective vehicles, Melegrito walked to his, entered it briefly, and then began walking toward Bacani. Gallardo testified that he put the keys in the Honda's ignition and then heard two gunshots. He saw Bacani on the ground. Gallardo testified that Melegrito then shot him through the car window, and as Gallardo attempted to get out of the vehicle, Melegrito fired his gun at him again.

3

Kauk testified that a few minutes after she went back inside, she heard gunshots. She came out of the house and saw Melegrito running down the driveway toward his vehicle. She also testified:

> I [saw Bacani] laying on the ground and I [saw Melegrito] . . . running to his car as fast as he could. And then [Gallardo] was standing there and saying, "Call the police, we've been shot." Then I ran back inside to grab my phone. Then when I came back out, [Gallardo] was like running towards [Bacani] and asking if he was okay, and then [Gallardo] collapsed to the ground.

Kauk called 911 as Melegrito drove away.

Melegrito testified that he drove home and when he arrived, no one was home, so he drove off and parked about a block away from his home. He eventually went to a family friend's home and asked his friend if he could borrow a shirt. Melegrito testified that he changed his shirt because he "didn't want to be disrespectful" by smelling of cigarette smoke.

Bacani and Gallardo were transported to the hospital, where they remained in critical condition for several days. Gallardo received surgery and had significant portions of his intestines removed. On November 20, 2016, after numerous surgeries, Bacani died.

King County sheriff's deputies began investigating the shooting and sought to apprehend Melegrito at his parents' home. Down the street from their home, the deputies stopped Moredes Melegrito, Melegrito's mother. She attempted to assist the officers in peacefully apprehending Melegrito. The King County SWAT team and Hostage Negotiation Team assembled outside of the Melegrito home and called for Melegrito to exit the house. He eventually did, but he began to turn away, in what deputies later described as an attempt to go back

toward the house. The officers then shot rubber bullets at Melegrito and arrested him.

The State charged Melegrito with murder and attempted murder, both in the second degree and both including firearm enhancements.

During voir dire, Melegrito challenged three jurors for cause: juror 34, juror 53, and juror 63. The court denied Melegrito's challenges for cause, and Melegrito then used his peremptory challenges on those three jurors.

Trial began on July 3, 2019. The arresting officer, Sergeant John Pavlovich, testified regarding the force used to arrest Melegrito. Melegrito objected to the testimony and contended that the evidence was irrelevant and unduly prejudicial. The State contended that this testimony was evidence of consciousness of guilt. The court admitted the evidence, concluding that it was relevant as potential consciousness of guilt and potential flight, and its probative value outweighed any unfair prejudice.

During Melegrito's testimony, the State asked Melegrito to reenact the shooting with a plastic gun. The State alleged that the demonstration was necessary to show where Melegrito was when he shot the victims and how he was holding the gun. Melegrito objected. The court overruled his objection, finding that the probative value outweighed the prejudicial effect. Melegrito reenacted the shooting with a plastic gun pointed at a detective and the State's intern.

Before deliberations, the court instructed the jury: "A separate crime is charged in each count. You must decide each count separately. Your verdict on

one count should not control your verdict on any other count." The jury instruction for count 1 provided the elements of the charged crime as against Bacani. The jury instruction for count 2 did not specify that the crime pertained to Melegrito's actions against Gallardo. However, during closing arguments, the State differentiated the conduct in both counts: count 1 applying to Bacani's death, and count 2 applying to Gallardo's injuries. In the State's rebuttal, the prosecutor made comments regarding Melegrito's counsel's theory of self-defense, claiming that he "salute[s]" the defense counsel for his presentation.

The jury found Melegrito guilty of both charges, thereby rejecting his claim of self-defense. However, when the jury concluded deliberations and presented the court with its verdict forms, the court discovered that the jury had left blank and unsigned the weapon sentence enhancement form. The court discussed the issue with the presiding juror who explained that the blank form was a mistake. The court asked the jury to return to the jury room to deliberate on the special verdict form. Shortly thereafter, the jury returned a verdict of guilty on both of the weapon enhancements.

At sentencing, the State asserted that Melegrito's firearm sentence enhancements doubled because he had a prior conviction with a firearm enhancement. Melegrito's sentencing brief admitted that he previously pleaded guilty to assault with a deadly weapon. Therefore, the court doubled the weapon enhancements and sentenced Melegrito to a total of 659 months.

Melegrito appeals.

ANALYSIS

Right to a Fair Trial

Melegrito asserts that he was denied his right to a fair trial when the trial court denied his for-cause challenges of three jurors. We disagree.

"The right to trial by an impartial jury is guaranteed by the Sixth Amendment to the United States Constitution and article 1, section 22 of the Washington Constitution." State v. Gonzales, 111 Wn. App. 276, 277, 45 P.3d 205 (2002). "To protect this right, a juror will be excused for cause if [their] views would 'prevent or substantially impair the performance of [their] duties as a juror in accordance with [the] instructions and [their] oath.'" Gonzales, 111 Wn. App. at 277-78 (internal quotation marks omitted) (quoting State v. Hughes, 106 Wn.2d 176, 181, 721 P.2d 902 (1986)).

*For-Cause Jury Challenges*

Melegrito alleges that the trial court erred when it denied his for-cause challenges to juror 34, juror 53, and juror 63. Even if the trial court erred, any error does not require reversal because Melegrito fails to show prejudice.

"The dismissal of a potential juror during voir dire is primarily governed by statute." State v. Sassen Van Elsloo, 191 Wn.2d 798, 808, 425 P.3d 807 (2018). "RCW 4.44.170 . . . outlines three reasons potential jurors may be challenged for particular cause: implied bias, actual bias, and physical inability." Van Elsloo, 191 Wn.2d at 808. "Actual bias" is "'the existence of a state of mind on the part of the juror in reference to the action, or to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice

7

to the substantial rights of the party challenging.'" Van Elsloo, 191 Wn.2d at 808 (quoting RCW 4.44.170(2)). A juror's opinion is not itself sufficient to sustain an actual bias challenge. RCW 4.44.190. Rather, "the court must be satisfied, from all the circumstances, that the juror cannot disregard such opinion and try the issue impartially," RCW 4.44.190, "'and without prejudice to the substantial rights of the party challenging' before dismissing the juror for actual bias." Van Elsloo, 191 Wn.2d at 809 (quoting RCW 4.44.170(2)).

"The trial judge is in the best position to evaluate whether a particular potential juror is able to be fair and impartial based on observation of mannerisms, demeanor and the like." Gonzales, 111 Wn. App. at 278. "We therefore review denial of a cause challenge for manifest abuse of discretion." Gonzales, 111 Wn. App. at 278. "'Abuse of discretion' means 'no reasonable judge would have ruled as the trial court did.'" State v. Arredondo, 188 Wn.2d 244, 256, 394 P.3d 348 (2017) (quoting State v. Mason, 160 Wn.2d 910, 934, 162 P.3d 396 (2007)).

In United States v. Martinez-Salazar, the trial court denied Abel Martinez-Salazar's for-cause challenge to a biased juror. 528 U.S. 304, 309, 120 S. Ct. 774, 145 L. Ed. 2d 792 (2000). The juror did not sit on the jury, and the impaneled jury convicted Martinez-Salazar. Martinez-Salazar, 528 U.S. at 309. On appeal, the Ninth Circuit held that the trial court erred and that the error "forced Martinez-Salazar to use a peremptory challenge curatively, thereby impairing his right to" the peremptory challenges he was entitled to and violating his due process rights. Martinez-Salazar, 528 U.S. at 309-10. It concluded that

8

the error required automatic reversal. Martinez-Salazar, 528 U.S. at 310. The United States Supreme Court disagreed. Martinez-Salazar, 528 U.S. at 317. It concluded that Martinez-Salazar's use of his peremptory challenge to correct a court error did not violate his Fifth Amendment right to due process. Martinez-Salazar, 528 U.S. at 317.

In State v. Fire (Fire I), Mink Fire was convicted of three counts of first degree child molestation after a jury trial. 100 Wn. App. 722, 723, 998 P.2d 362 (2000), rev'd, State v. Fire (Fire II), 145 Wn.2d 152, 34 P.3d 1218 (2001). On appeal, Fire asserted that the trial court erred when it denied his for-cause challenge to a juror who expressed that he believed Fire was "'a baby raper'" and would not believe him over the child. Fire I, 100 Wn. App. at 724-25. We reversed the conviction and remanded for a new trial because the court's error resulted in Fire exhausting all of his peremptory challenges. Fire I, 100 Wn. App. at 729. We declined to follow Martinez-Salazar and held that, due to the court's error, Fire was denied his right to use his peremptory challenge. Fire I, 100 Wn. App. at 729. According to our Supreme Court in Fire II, 145 Wn.2d at 159, we "implicitly [held] that although Fire may not have had any grounds for relief under the United States Constitution and federal case law, he [did] under the Washington Constitution and Washington case law," i.e., State v. Parnell, 77 Wn.2d 503, 463 P.2d 134 (1969), abrogated by Fire II, 145 Wn.2d 152.

However, our Supreme Court's decision in Fire II, reversed our decision. The court declined to decide whether the juror should have been excused for cause. Fire II, 145 Wn.2d at 154. Instead, it relied on the fact that Fire failed to

9

"further show or even attempt to show that a biased juror sat on his panel" and that, therefore, "Fire had not been deprived of any federal constitutional right." Fire II, 145 Wn.2d at 159. It concluded that reversal was not required. Fire II, 145 Wn.2d at 159. In addition, our Supreme Court "expressly abandon[ed]" the Parnell rule. Fire II, 145 Wn.2d at 165. The court concluded that the Parnell rule was "no longer viable in Washington law" because, after State v. Roberts, 142 Wn.2d 471, 14 P.3d 713 (2000), the court "no longer recognizes that the forced use of a peremptory challenge constitutes the loss or deprivation of a challenge." Fire II, 145 Wn.2d at 163. The court also concluded that "[n]o Washington case has thus far recognized a difference between the right to an impartial jury" under federal and Washington constitutions. Fire II, 145 Wn.2d at 163. It therefore applied Martinez-Salazar to determine the scope of the right to an impartial jury. Fire II, 145 Wn.2d at 163. Finally, the court declined to consider Fire's claim under the Washington Constitution because "[i]f the party has not engaged in a Gunwall[1] analysis, th[e] court will consider [their] claim only under federal constitutional law." Fire II, 145 Wn.2d at 163-64. In short, a defendant's use of all of their peremptory strikes alone is not a basis for reversing a conviction. Fire II, 145 Wn.2d at 163. Instead, a defendant must demonstrate that a biased juror sat on the jury and that this prejudiced them. Fire II, 145 Wn.2d at 165.

Here, Melegrito asserts that juror 34, juror 53, and juror 63 were biased and that the trial court erred when it denied his for-cause challenges to those jurors. Because the court denied Melegrito's for-cause challenges to the three

---

[1] State v. Gunwall, 106 Wn.2d 54, 720 P.2d 808 (1986).

jurors, he utilized and exhausted his peremptory strikes to dismiss them. But contrary to Melegrito's assertion, we are not required to reverse a conviction where the defendant used all of their peremptory challenges to correct the court's errors in denying a for-cause challenges. Rather, "[w]here a trial court erroneously denies a defendant's for-cause challenge and the defendant is forced to use a peremptory challenge to cure the trial court's error, [their] rights are not violated so long as [they are] subsequently convicted by a jury on which no biased juror sat." State v. Schierman, 192 Wn.2d 577, 632, 438 P.3d 1063 (2018). No biased juror sat on the jury. Furthermore, Melegrito does not assert prejudice beyond the use of his peremptory strikes to dismiss the jurors. Therefore, any error is not grounds for reversal.

Melegrito disagrees and relies on Gonzales, Fire I, and United States v. Kechedzian, 902 F.3d 1023 (9th Cir. 2018), to support his contention that we must reverse his conviction. Gonzales and Kechedzian involved instances where a juror with actual bias sat on the jury. Gonzales, 111 Wn. App. at 278-79, 281-82 (where the circumstances as a whole indicated actual bias, the court erred in denying the defendant's for-cause challenge, and because the biased juror sat on the jury, the conviction must be reversed); Kechedzian, 902 F.3d at 1026, 1031 (reversing the defendant's conviction because a biased juror sat on the panel after the trial court denied the defendant's for-cause challenge of that juror). Unlike Gonzales and Kechedzian, no biased juror sat on the jury panel. Moreover, Fire II reversed Fire I, and this court's decision in Fire I does not control.

*Gunwall Analysis*

Melegrito asserts that Washington's jury trial right is different than the federal guaranty under the Gunwall analysis. Specifically, Melegrito asserts that "[t]his Court should hold that the Parnell rule is required under the Washington Constitution." We disagree.

The Gunwall factors provide "nonexclusive neutral criteria" to assist a court's determination of "whether, in a given situation, the Washington State Constitution should be considered as extending broader rights to its citizens than the United States Constitution." Gunwall, 106 Wn.2d at 58. This court has concluded that "all of the Gunwall factors support the conclusion that the state constitution provides the same protection as the federal constitution" with regard to impartiality of the jury and deprivation of peremptory challenges. State v. Rivera, 108 Wn. App. 645, 648 n.2, 32 P.3d 292 (2001). We follow this precedent. Therefore, we do not analyze Melegrito's jury trial right separately under Washington state law.

Melegrito asserts that the court must apply the rule which Parnell set forth, i.e.:

> "A refusal to sustain challenges for proper cause, necessitating peremptory challenges on the part of the accused, will be considered on appeal as prejudicial where the accused has been compelled subsequently to exhaust all his peremptory challenges before the final selection of the jury."

77 Wn.2d at 508 (quoting State v. Stentz, 30 Wash. 134, 143, 70 P. 241 (1902), abrogated by Fire II, 145 Wn.2d 152). In short, the Parnell rule provides that a defendant's necessary exhaustion of peremptory challenges after an improper

12

refusal to dismiss for cause is prejudicial and requires reversal.

Melegrito misunderstands Fire II, which abrogated Parnell, and "fails to appreciate the doctrine of stare decisis."  See State v. Kier, 164 Wn.2d 798, 804, 194 P.3d 212 (2008) (concluding that where the State suggested that the court not follow the court's prior decision, the State was not appreciating the doctrine of stare decisis).  Because Fire had not asserted a Gunwall distinction, the court did not perform a Gunwall analysis.  However, it still held that Parnell is not viable law in *Washington.*  Therefore, Melegrito's assertion fails.[2]

Evidentiary Challenges

Melegrito challenges the court's admission of police testimony about his actions during his arrest and of demonstrative evidence of the shooting.  We disagree that the trial court abused its discretion when it admitted evidence of Melegrito's actions up until and during his arrest.  And although we agree that the trial court improperly allowed the State to have Melegrito demonstrate the incident with a toy gun, we conclude that the error was harmless.

We review decisions to admit evidence for abuse of discretion.  State v. Demery, 144 Wn.2d 753, 758, 30 P.3d 1278 (2001).  "'Abuse of discretion' means 'no reasonable judge would have ruled as the trial court did.'  Put another way, to reverse we must find the decision is 'unreasonable or is based on untenable reasons or grounds.'"  Arredondo, 188 Wn.2d at 256 (internal quotation marks omitted) (quoting Mason, 160 Wn.2d at 922, 934).  Generally,

---

[2] We acknowledge that Justice Roberts' dissent in Martinez-Salazar puts at issue the Gunwall analysis as it pertains to Parnell.  However, it is not precedential and therefore does not change our analysis.

"[a]ll relevant evidence is admissible . . . . Evidence which is not relevant is not admissible." ER 402. "Under ER 401, 'relevant evidence' is evidence that tends to make the existence of a material fact more or less probable, and, in a normal adjudication of criminal or civil liability, expert opinion does not satisfy this standard unless it is expressed to a reasonable degree of probability." Schierman, 192 Wn.2d at 682-83.

Relevant evidence may be inadmissible "if its probative value is substantially outweighed by the danger of unfair prejudice." ER 403. To this end, there is "broad discretion afforded [to] a trial court in balancing the prejudicial impact of evidence against its probative value." Kramer v. J.I. Case Mfg. Co., 62 Wn. App. 544, 559, 815 P.2d 798 (1991).

*Evidence of Flight as Consciousness of Guilt*

Melegrito asserts that the trial court erred when it allowed the State to admit evidence of his arrest, including evidence that the police had to shoot him with nonlethal ammunition. We disagree.

"Evidence of flight is admissible if it creates 'a reasonable and substantive inference that defendant's departure from the scene was an instinctive or impulsive reaction to a consciousness of guilt or was a deliberate effort to evade arrest and prosecution.'" State v. Freeburg, 105 Wn. App. 492, 497, 20 P.3d 984 (2001) (quoting State v. Nichols, 5 Wn. App. 657, 660, 491 P.2d 677 (1971)). "Actual flight is not the only evidence in this category; evidence of resistance to arrest, concealment, assumption of a false name, and related conduct are admissible if they allow a reasonable inference of consciousness of guilt of the

14

charged crime." Freeburg, 105 Wn. App. at 497-98. "[W]hile the range of circumstances that may be shown as evidence of flight is broad, the circumstance or inference of consciousness of guilt must be substantial and real, not speculative, conjectural, or fanciful." Freeburg, 105 Wn. App. at 498.

Here, Sergeant Pavlovich testified that he arranged to have Melegrito's mother assist the officers' peaceful arrest of Melegrito. He testified that when around 10 to 12 officers approached the house, their presence was "very obvious" with flashing lights and no obstructions. Melegrito exited the home, and when the officers commanded him to come toward them and get in a prone position, he turned around and took steps back toward the house. In response, one officer fired "a large rubber bullet" at Melegrito, striking below his hip. Sergeant Pavlovich testified that they did not let Melegrito reenter the home because it was "[t]oo dangerous under th[e] circumstances," i.e., when there were other individuals in the home and the officers were concerned about a hostage situation.

The evidence in this case establishes that Melegrito fled the scene of the crime, that he changed his shirt at a family friend's home, and that, when the officers came to apprehend him, he began to walk back toward the house. These circumstances provide a reasonable and substantive inference that Melegrito's actions represented an instinctive and impulsive reaction to a consciousness of guilt. Therefore, the trial court did not abuse its discretion in admitting the evidence.

Melegrito disagrees, citing Freeburg. But Freeburg is easily

distinguishable. There, the trial court admitted evidence that Freeburg possessed a gun when he was apprehended in Canada more than two years after his charged crime. Freeburg, 105 Wn. App. at 499, 500-01. We concluded that the evidence was inadmissible and that its admission was not harmless. Freeburg, 105 Wn. App. at 501-02. Here, the circumstances in which Melegrito sought to resist arrest came immediately after the shooting and involved his affirmative actions where he attempted to flee. Mere possession of a gun is dissimilar to an attempt to leave when the police seek to arrest you. Therefore, Freeburg is not analogous.

*Demonstrative Evidence*

Melegrito contends that the trial court erred when it allowed the State to have Melegrito reenact the shooting with a toy gun. We agree but conclude that the error was harmless.

"The trial court has broad discretion to decide whether to permit demonstrations and experiments in the jury's presence." State v. Burkins, 94 Wn. App. 677, 692, 973 P.2d 15 (1999). To this end, "[t]he use of demonstrative evidence is encouraged when it accurately illustrates facts sought to be proved." State v. Finch, 137 Wn.2d 792, 816, 975 P.2d 967 (1999). "Demonstrative evidence is admissible if the experiment was conducted under substantially similar conditions as the event at issue." Finch, 137 Wn.2d at 816. But demonstrative evidence "need not exactly portray the event in question." Finch, 137 Wn.2d at 816.

The State asked Melegrito to reenact the shooting with a young white

male acting as Gallardo and the case detective acting as Bacani. Melegrito

objected. The court overruled his objection and concluded:

> [I]t's the defense and the defendant himself that has put in issue
> how this shooting happened, how he used the weapon. And so
> getting a specific recount or as specific a recount as possible is
> obviously relevant under [ER] 401 and 402. There's no question
> that it's relevant.
> . . . I think the probative value of this far outweighs any
> potential prejudice to Mr. Melegrito.

1. Relevance

First, we conclude that the demonstrative exhibit was relevant.

Melegrito's testimony put his and his gun's position relative to the victims

at issue. Specifically, he testified that Bacani was behind him when he decided

to shoot him. Melegrito testified that he shot from his waist at Bacani and that he

shot into the vehicle at Gallardo with no clear view of him. Yet, he shot Gallardo

four times, including once in the shoulder. And although the circumstances at

trial could not mimic those at the scene, Melegrito could and did attempt to

explain his position relative to the surroundings, not only with the demonstrative

exhibit but also with illustrations of the scene. Therefore, the evidence was

sufficiently similar and relevant.

2. ER 403 Balancing Test

The danger of unfair prejudice stemming from the State's use of the

demonstrative exhibit, and particularly the use of a plastic gun, substantially

outweighed the evidence's probative value.

Once evidence is deemed relevant, a trial court must review its prejudicial

effect. "ER 403 requires exclusion of evidence, even if relevant, if its probative

value is substantially outweighed by the danger of unfair prejudice." State v. Smith, 106 Wn.2d 772, 776, 725 P.2d 951 (1986) (emphasis omitted).

Although Melegrito put the matter of his gun's placement relative to Bacardi and Gallardo at issue, the use of a plastic gun had little value in general and, in particular, had little probative value. That is, there were many other ways for Melegrito to reenact the shooting without requiring him to hold the obvious and prejudicial toy gun. For example, Melegrito could have used his fingers as a gun. Instead, the State gave him a bright toy gun to point around the room. To have probative value, "'the evidence must tend to make the existence of the identified fact more . . . probable.'" See Smith, 106 Wn.2d at 776 (alteration in original) (quoting State v. Saltarelli, 98 Wn.2d 358, 363, 655 P.2d 697 (1982)). But here, the use of a toy gun did not make the fact that Melegrito used a gun in commission of the crime more or less probable. Thus, the probative value was extremely low.

In contrast, the risk of unfair prejudice was extremely high in this situation. Melegrito had to yield the gun and reenact the shooting, potentially frightening jurors and certainly making Melegrito out to be a criminal. The State also used a young individual, its intern, and a detective to play the parts of Gallardo and Bacani. Furthermore, the court's actions support the highly prejudicial nature of these facts. Specifically, with the use of the plastic gun, the court increased the number of security guards in the courtroom and required that the demonstration

was done away from the jury.[3]

Because the use of a toy gun was of such little probative value and the State could have accomplished the demonstrative exhibit without the gun and because the prejudicial effect was high, the probative value of the toy gun in the demonstrative exhibit was substantially outweighed by the danger of unfair prejudice. See, e.g., State v. Mee, 168 Wn. App. 144, 159, 275 P.3d 1192 (2012) (holding that, where evidence of the defendant's gang-related conduct was not at issue, the evidence had little probative value except to "'suggest[ ] that a defendant is guilty because he or she is a criminal-type person who would be likely to commit the crime charged'" and that the prejudicial effect substantially outweighed that probative value (alteration in original)); see also Smith, 106 Wn.2d at 779-80 (holding that evidence of burglaries that did not involve "any distinctive similarities" to the rape charges at issue, had "limited probative value" and "the danger of unfair prejudice loom[ed] large").

3.    Harmless Error

Here, this evidentiary error does not rise to the level of a constitutional error, so we do not apply the rigorous constitutional harmless error test. See State v. Tharp, 96 Wn.2d 591, 598-99, 637 P.2d 961 (1981) (declining to apply the constitutional harmless error test where multiple evidentiary errors, including one pertaining to the admission of overly prejudicial evidence, did not rise to a constitutional error). Rather, "we apply the rule that error is not prejudicial

---

[3] The court stated, "I actually want this chair moved back away from the jury, because I don't want Mr. Melegrito even with this fake handgun too close to the jury because I think that potentially is prejudicial."

19

unless, within reasonable probabilities, the outcome of trial would have been materially affected had the error not occurred." Tharp, 96 Wn.2d at 599.

The State presented substantial evidence, including Gallardo's testimony that Melegrito did not act in self-defense. Melegrito's flight from the scene and from the officers provides additional evidence. Most importantly, Melegrito admitted to holding a gun, and although holding a plastic gun in front of the jury provides a prejudicial visual, it is not reasonably probable that the physical demonstration materially affected the outcome of the trial. Therefore, the error was harmless.

### Prosecutorial Misconduct

Melegrito asserts that the prosecutor committed misconduct by disparaging the defense counsel. Melegrito fails to present evidence that the prosecutor's comments affected the jury's verdict.

"'Allegations of prosecutorial misconduct are reviewed under an abuse of discretion standard.'" State v. Lindsay, 180 Wn.2d 423, 430, 326 P.3d 125 (2014) (quoting State v. Brett, 126 Wn.2d 136, 174-75, 892 P.2d 29 (1995)). "To prevail on a claim of prosecutorial misconduct, a defendant must show first that the prosecutor's comments were improper and second that the comments were prejudicial." State v. Warren, 165 Wn.2d 17, 26, 195 P.3d 940 (2008). To show prejudice, the defendant "must show a substantial likelihood that the prosecutor's statements affected the jury's verdict." Lindsay, 180 Wn.2d at 440. "In analyzing prejudice, we do not look at the comments in isolation, but in the context of the total argument, the issues in the case, the evidence, and the instructions given to

the jury." Warren, 165 Wn.2d at 28.

Here, the prosecutor claimed that, during closing arguments, defense counsel took "a very difficult set of facts, and I salute him for spinning them as positively as he could." Whether improper or not, Melegrito fails to show that these "sarcastic[ ]" comments prejudiced the jury against him: Melegrito provides no evidence and makes no argument that there is a substantial likelihood that the statements affected the jury's verdict. Therefore, his prosecutorial misconduct claim fails.

Melegrito disagrees and analogizes his case to State v. Thierry, 190 Wn. App. 680, 360 P.3d 940 (2015). There, a jury convicted Alfred James Thierry Jr. of four counts of first degree child rape and two counts of first degree child molestation. Thierry, 190 Wn. App. at 681-82. During closing arguments, the prosecutor directly commented multiple times on the veracity of the victim that contradicted the defense theory attacking credibility. Thierry, 190 Wn. App. at 687-88. Thierry alleged that these comments denied him his right to a fair trial and constituted prosecutorial misconduct. Thierry, 190 Wn. App. at 689. On appeal, the court concluded that the numerous statements made by the prosecutor regarding the victim's veracity constituted reversible error because they had a substantial likelihood of affecting the verdict. Thierry, 190 Wn. App. at 689, 694-95.

In this case, unlike in Thierry, the prosecutor did not comment on the veracity of Melegrito's story directly and only made one comment. Furthermore,

Melegrito does not provide a basis for concluding that the statement had a substantial likelihood of affecting the verdict. Therefore, we are not persuaded.[4]

### Special Verdict Form

Melegrito asserts that the trial court erred when it sent the jury back to deliberate regarding the special verdict for weapon enhancements. We disagree.

"After jury deliberations have begun, the court shall not instruct the jury in such a way as to suggest the need for agreement, the consequences of no agreement, or the length of time a jury will be required to deliberate." CrR 6.15(f)(2). However, the court is not prohibited from providing supplemental instructions. See State v. Watkins, 99 Wn.2d 166, 175-76, 660 P.2d 1117 (1983) ("The supplemental instruction given by the trial court in this case" does not violate any court rules.). To discern whether a trial court improperly coerced a decision from the jury, we consider all of the "circumstances of the trial court's intervention during the jury's deliberations." Watkins, 99 Wn.2d at 177.

Here, when the jury returned from deliberation with a verdict, the court collected the verdict forms and then dismissed the jury. The court then indicated to the parties that it had not dealt with this issue before but that the jury did not fill

---

[4] Melegrito asserts that "[t]he prejudicial impact of the prosecutor's improper arguments should be assessed cumulatively with the court's admission of other unfairly prejudicial evidence." "'The cumulative error doctrine applies where a combination of trial errors denies the accused a fair trial even where any one of the errors, taken individually, may not justify reversal.'" State v. Song Wang, 5 Wn. App. 2d 12, 31, 424 P.3d 1251 (2018) (quoting In re Detention of Coe, 175 Wn.2d 482, 515, 286 P.3d 29 (2012)). Because we conclude that Melegrito's prosecutorial conduct claim fails and because the only other error was the court's decision to allow the demonstrative evidence, the cumulative error doctrine does not apply.

out the verdict form. Specifically, the jury did not indicate yes or no on the special verdict form and did not sign it, although it includes a line for a signature. The court decided that it would "bring the jury out and just indicate to them that they need to refer to jury instruction 22," the instruction regarding the firearm enhancements. Melegrito objected. The jury returned, and the following exchange took place between the presiding juror and the court:

> [THE COURT:] First question. Was instruction 22 and the special verdict form considered during the jury's deliberations? Yes or no.
> JUROR NUMBER 2: Yes.
> THE COURT: And second, the special verdict form is blank. Was the special verdict form intentionally left blank?
> JUROR NUMBER 2: No. It was accidentally left blank.

The court secured the other verdict forms, provided instruction 22 and the special verdict form to the jury, and asked the jury to "go back to the jury room and continue" deliberating. The jury returned and answered affirmatively that Melegrito was armed with a firearm during the commission of the crimes in count 1 and count 2.

In short, there was no dispute that Melegrito was armed with a deadly weapon during the commission of the crimes, the record does not indicate that the jury deadlocked on the issue, the jury returned promptly after the court sent them back to reconsider the special verdict form, and there is no indication that the jury had signed the special verdict form. Most importantly, the presiding juror admitted that the jury accidently left the special verdict form blank. Therefore, the court did not coerce the jury into returning a particular answer on the special verdict form.

Melegrito disagrees and relies on State v. Guzman Nunez, 174 Wn.2d 707, 285 P.3d 21 (2012), for the proposition that "[j]urors are authorized to 'leave a special verdict form blank,' if they cannot agree." The court in Guzman Nunez adopted the rule that requires "a jury to leave a special verdict form blank if it could not agree." Guzman Nunez, 174 Wn.2d at 719. But here, the jury agreed on the special verdict answers, as demonstrated in each juror's confirmation that the special verdict was their verdict, and the jury did not intend to leave the form blank. Therefore, Guzman Nunez does not inform our analysis of this issue.

Double Jeopardy

Melegrito contends that the jury instructions failed to differentiate between his conduct against Bacani and his conduct against Gallardo and that this failure subjected him to double jeopardy for the death of Bacani. Because the record as a whole distinguishes between the two counts and Melegrito's distinct acts against the two victims, we disagree.

"Article I, section 9 of the state constitution and the double jeopardy clause of the Fifth Amendment to the United States Constitution protect against multiple punishments for the same offense." State v. Madden, 16 Wn. App. 2d 327, 332, 480 P.3d 1154 (2021). "The double jeopardy clause of the United States Constitution provides that no individual shall 'be twice put in jeopardy of life or limb' for the same offense, and the Washington Constitution provides that no individual 'be twice put in jeopardy for the same offense.'" State v. Robinson, 8 Wn. App. 2d 629, 638, 439 P.3d 710 (2019) (quoting U.S. CONST. amend. V; WASH. CONST. art. I, § 9). "The Fifth Amendment's double jeopardy protection 'is

applicable to the States through the Fourteenth Amendment.'" Robinson, 8 Wn. App. 2d at 638 (quoting Benton v. Maryland, 395 U.S. 784, 787, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969)).

"The double jeopardy provisions of the state and federal constitutions protect against (1) a second prosecution for the same offense after an acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense." Robinson, 8 Wn. App. 2d at 638. "'When a person is charged with multiple counts of the same offense, each count must be based on a separate and distinct criminal act.'" Madden, 16 Wn. App. 2d at 332 (internal quotation marks omitted) (quoting Robinson, 8 Wn. App. 2d at 638). "But the absence of a separate and distinct act instruction is not fatal; it creates only the potential for a double jeopardy violation." State v. Sage, 1 Wn. App. 2d 685, 695, 407 P.3d 359 (2017).

"'[I]n reviewing allegations of double jeopardy, an appellate court may review the entire record to establish what was before the court.'" State v. Mutch, 171 Wn.2d 646, 664, 254 P.3d 803 (2011) (alteration in original) (quoting State v. Noltie, 116 Wn.2d 831, 848-49, 809 P.2d 190 (1991)). "Considering the evidence, arguments, and instructions, if it is not clear that it was 'manifestly apparent to the jury that the State [was] not seeking to impose multiple punishments for the same offense' and that each count was based on a separate act, there is a double jeopardy violation." Mutch, 171 Wn.2d at 664 (emphasis omitted) (quoting State v. Berg, 147 Wn. App. 923, 931, 198 P.3d 529 (2008), disapproved of on other grounds by Mutch, 171 Wn.2d 646).

Sage is instructive.  There, two victims testified that Jonathan Sage frequently raped them.  Sage, 1 Wn. App. 2d at 690-91.  The State charged Sage with two counts of second degree rape of a child for each victim.  Sage, 1 Wn. App. 2d at 693.  The court failed to instruct the jury that it must find separate and distinct acts occurred for each of five counts of rape that the State charged the defendant with.  Sage, 1 Wn. App. 2d at 694.  However, the court provided the following instruction after each "elements instruction":

> "The State of Washington alleges that the defendant committed acts of Rape of a Child in the Second Degree on multiple occasions.  To convict the defendant on Count [I, II, III, IV] of Rape of a Child in the Second Degree, one particular act of Rape of a Child in the Second Degree must be proved beyond a reasonable doubt, and you must unanimously agree as to which act has been proved.  You need not unanimously agree that the defendant committed all the acts of Rape of a Child in the Second Degree."

Sage, 1 Wn. App. 2d at 698 (alteration in original).  The trial court also provided an instruction to decide each count separately: "'A separate crime is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count."  Sage, 1 Wn. App. 2d at 698.  The jury convicted Sage as charged.  Sage, 1 Wn. App. 2d at 694.  This court held that the trial court's failure to instruct the jury that each count must come from a separate and distinct act did not violate double jeopardy.  Sage, 1 Wn. App. 2d at 698.  Specifically,

> [i]n view of the prosecutor's election of separate and distinct events in closing, and the victim's supporting testimony, the unanimity instructions given, together with separate to convict instructions for each count and the separate consideration instruction, we conclude it was manifestly apparent to the jury that the State was not seeking multiple convictions based on a single act.

Sage, 1 Wn. App. 2d at 698.

Similarly, in Mutch, Richard Henry Mutch repeatedly raped J.L. in her home beginning the night of February 2 into the morning of February 3, 1994. Mutch, 171 Wn.2d at 651, 662. A jury convicted Mutch of five counts of second degree rape and one count of second degree kidnapping. Mutch, 171 Wn.2d at 652. "[T]he 'to convict' instructions for each rape count were nearly identical, including that they all indicated the same time of occurrence of the criminal conduct, between 'the 2nd day of February, 1994 and the 3rd day of February, 1994.'" Mutch, 171 Wn.2d at 662. The court also instructed the jury that it must "'deliberate with a view to reaching a unanimous verdict'" and that "'[a] separate crime is charged in each count.'" Mutch, 171 Wn.2d at 662-63 (alteration in original). On appeal, the court concluded that "despite deficient jury instructions, it is nevertheless manifestly apparent that the jury found [Mutch] guilty of five separate acts of rape" because the record, including the victim's testimony, clearly established five separate acts of rape. Mutch, 171 Wn.2d at 665-66.

Here, the to-convict instruction for count 1 provided:

> To convict the defendant of the crime of Murder in the Second Degree, . . . each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about November 2, 2016, the defendant acted with intent to cause the death of John Bacani;
> (2) That John Bacani died as a result of defendant's acts; and
> (3) That any of these acts occurred in the State of Washington.

The to-convict instruction for count 2 stated:

> To convict the defendant of the crime of Attempted Murder in the Second Degree, . . . each of the following elements of the crime must be proved beyond a reasonable doubt:

> (1) That on or about November 2, 2016, the defendant did an act that was a substantial step toward the commission of Murder in the Second Degree;
> (2) That the act was done with the intent to commit Murder in the Second Degree; and
> (3) That the act occurred in the State of Washington.

The trial court also instructed the jury that "[a] separate crime is charged in each count," that it "must decide each count separately," and that it must "deliberate in an effort to reach a unanimous verdict." However, like in Sage and Mutch, "[t]he jury instructions . . . [failed] to include a 'separate and distinct' instruction." Mutch, 171 Wn.2d at 663.

The court's instruction regarding count 2 should have more clearly stated that the at-issue conduct was Melegrito's assault of Gallardo. Nonetheless, the record as a whole demonstrates that the two counts were based off of separate and distinct conduct. Specifically, like in Sage, the State made clear in closing arguments that count 2 pertained to Gallardo. With regard to count 1, the State argued: "Number 1. On November 2nd, 2016, the defendant acted with intent to cause the death of John Bacani. Number 2. John Bacani died as a result of the defendant's acts. And number 3. That that occurred in the state of Washington." With regard to count 2, the State argued: "The second count, Count 2, is attempted murder in the second degree. This is the count that goes to the shooting of Mark Gallardo." In arguing that Melegrito was guilty of count 2, the State also stated: "Of course" Melegrito took a substantial step toward the murder of Gallardo: "[Melegrito] pumped four bullets into" Gallardo's body. Furthermore, the testimony at trial clearly established that Melegrito was being charged with the murder of Bacani and the attempted murder of Gallardo, who

28

testified at trial. Accordingly, the instructions and the verdicts did not violate double jeopardy because the State and the evidence properly distinguished between the two counts and the two victims.

Melegrito relies heavily on Kier to support his assertion that the court's failure to more clearly instruct the jury resulted in convictions that violate double jeopardy. In Kier, Herbert John Kier and two accomplices carjacked Qualagine Hudson's vehicle. 164 Wn.2d at 802. Hudson's cousin, Carlos Ellison, was seated in the passenger seat at the time of the robbery. Kier, 164 Wn.2d at 802-03. Kier pointed a gun at Ellison, demanding that he exit the car. Kier, 164 Wn.2d at 802. The State charged Kier with first degree robbery as to Hudson and second degree assault as to Ellison. Kier, 164 Wn.2d at 803. The court concluded that this was a violation of double jeopardy because, although the victims were different for each charge, the first degree robbery charge was based on the second degree assault, i.e., "the completed assault was necessary to elevate the completed robbery to first degree." Kier, 164 Wn.2d at 807. Therefore, the second degree assault merged with the robbery conviction. Kier, 164 Wn.2d at 808, 814. Kier is factually distinct because, here, the charged crimes relate to Melegrito shooting at two distinct victims and therefore cannot merge.

### Sentence Enhancements

Melegrito asserts that the trial court erred when it doubled his sentence enhancements. We disagree.

"In calculating the offender score, the State must prove the criminal history

29

by a preponderance of the evidence." State v. Cate, 194 Wn.2d 909, 912-13, 453 P.3d 990 (2019). "Bare assertions, unsupported by evidence, do not satisfy the State's burden to prove the existence of a prior conviction." State v. Hunley, 175 Wn.2d 901, 910, 287 P.3d 584 (2012). "There must be some affirmative acknowledgment of the facts and information alleged at sentencing in order to relieve the State of its evidentiary obligations." Hunley, 175 Wn.2d at 912 (emphasis omitted). However, "'[t]he federal constitution does not require that prior convictions be proved to a jury beyond a reasonable doubt.'" Mutch, 171 Wn.2d at 659 (alternation in original) (quoting State v. Smith, 150 Wn.2d 135, 143, 75 P.3d 934 (2003)).

In Cate, our Supreme Court concluded that where the defendant "only directly admitted to convictions with respect to two prior cause numbers and vaguely admitted to two more," the State did not satisfy its burden of proof regarding additional convictions that the defendant did not admit to and that the State only summarized. Cate, 194 Wn.2d at 913-14. In contrast, here, in Melegrito's sentencing recommendation, Melegrito's counsel affirmatively admitted that Melegrito "pled guilty to Assault in the Second Degree with a Firearm." Because Melegrito admitted he pleaded guilty to assault with a firearm, the State was not required to supply additional proof. Therefore, the sentencing court correctly calculated Melegrito's offender score.

We affirm.

WE CONCUR:

Mann, C.J.