**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>                Respondent,<br><br>   v.<br><br>RICHARD RAY BALL,<br><br>                Appellant. | No. 58957-5-II<br><br><br>UNPUBLISHED OPINION |

PRICE, J. — Richard R. Ball appeals his conviction and sentence for first degree child molestation. Ball challenges his conviction, arguing that the State committed prosecutorial misconduct during closing argument by relying on evidence outside the record. Ball challenges his sentence, arguing that he was subjected to unconstitutional restraint during his sentencing hearing. Ball also argues that two of his community custody conditions are unconstitutional. Finally, Ball argues that a scrivener's error in his judgment and sentence needs to be corrected, and the victim penalty assessment (VPA) should be stricken.

We affirm Ball's conviction, and we decline to consider Ball's challenge to his restraint during sentencing for the first time on appeal. But we remand for the trial court to reconsider the language and imposition of the appealed community custody conditions, to correct the scrivener's error in the judgment and sentence, and to strike the VPA.

In a statement of additional grounds (SAG),[1] Ball raises several additional claims challenging his conviction and sentence. Ball's SAG claims lack merit.

---

[1] RAP 10.10.

FACTS

I. BACKGROUND

Ball and his wife, Alicia,[2] began dating in 2015 and both had children from prior relationships. In 2016, they moved in together and began to integrate their families: Ball and his two children, and Alicia and her daughter, W.S.B.

In October 2022, 10-year-old W.S.B. told her stepbrother, Gabe, that something inappropriate had happened with Ball. Gabe took W.S.B. to Alicia and helped start their conversation before leaving them to talk privately.

Alicia recorded her conversation with W.S.B. with her phone. In the recording, W.S.B. said, "Dad was just sitting there," referring to Ball, and then at "11:46 or something" he grabbed her hand and "rubbed it onto his private." Verbatim Rep. of Proc. (VRP) at 165-66. W.S.B. told her mom that once he stopped, he moved her hand back under the blankets and went upstairs. When W.S.B. heard Ball get into bed upstairs, she "immediately went to the bathroom. . . . and . . . pinched [her]self to make sure [she] wasn't dreaming . . . ." VRP at 166.

Based on W.S.B.'s disclosure, Alicia called the police. Deputy Brad Bauman arrived shortly thereafter. He spoke briefly with Ball and suggested that Ball should arrange to sleep elsewhere while the investigation continued. Ball agreed. While Ball packed a bag, Alicia played the recording for the officer. Upon hearing W.S.B.'s recorded disclosure, Deputy Bauman arrested Ball.

Ball was charged with first-degree child molestation. Ball waived his right to a jury, and the case proceeded to a bench trial.

---

[2] Richard R. Ball and Alicia Ball were married in 2019. For clarity, we refer to Alicia Ball by her first name in this opinion because she shares the same last name as the appellant.

II. TRIAL

W.S.B., Alicia, and Deputy Bauman testified at the bench trial.

W.S.B. testified that she woke up about "11:40-something," judging by the TV screensaver, and Ball was next to her. While she pretended to be asleep, he grabbed her hand "soft and gently" and "[h]e made [her] touch his private." VRP at 53-54. He made her hand go in an "up and down motion," and her hands were "like a Lego figure's hands," and she felt a "speed bump." VRP at 54.

W.S.B. also testified that she told "Kristen" at the Children's Justice and Advocacy Center what happened. VRP at 61. W.S.B. also shared her account of the incident during a defense interview with defense counsel and a private investigator. In her testimony, W.S.B. did not repeat exactly what she said during these two interviews.

During cross-examination, Ball asked W.S.B. several questions to lay out alternative motives and possible explanations for her allegations. Ball asked W.S.B. whether it was "even a little bit possible" that the alleged incident was just a dream. VRP at 67. W.S.B. responded, "Just a little bit." VRP at 67. W.S.B. also testified that adults and, specifically, her mom sometimes help her remember certain events, but when she was asked if her mom helped her remember the alleged incident, W.S.B. said no.

Alicia testified consistently with W.S.B.'s testimony. Alicia emphasized that she only encouraged W.S.B. to "tell her truths" and to "let [W.S.B.] tell her story." VRP at 90-91, 95.

Deputy Bauman testified that on October 30, 2022, he responded to a report of child molestation. Deputy Bauman explained that he used his county phone to record Alicia's recording of W.S.B.'s initial disclosure. The State moved to admit the deputy's recording. Ball stated he had no objection, and the recording was admitted into evidence.

Deputy Bauman also testified that because W.S.B. said the incident took place on the couch, he decided to take photos and collect evidence. The deputy provided the evidence to the investigating detectives. In the year following the arrest and prior to trial, detectives never followed up with Deputy Bauman and to the best of his knowledge, none of the evidence he collected was tested for DNA or the presence of semen.

Even though there was no evidence admitted about what W.S.B. said at either the forensic interview or the defense interview, in closing argument, the State mentioned that W.S.B. gave these additional interviews and claimed that, each time, her statements were consistent:

> You heard [W.S.B.] testify that once all this started, she went and got a forensic interview. . . . [S]he had a [d]efense interview conducted by [defense counsel] and his private investigator, there were no inconsistencies brought out from her [d]efense interview to her testimony today. . . . [T]he level of detail that was provided by W.S.B., described by her back right when the disclosure happened and in the testimony are very, very, very similar, and they're very consistent. And that should go to the credibility of W.S.B. as much as the [d]efense tried to impeach her.

VRP at 154. Defense counsel did not object.

> The State reinforced this assertion of W.S.B.'s credibility again later in its closing:

> [T]hese are very serious allegations, and W.S.B. knew that going into this. And yet she still went into the forensic interview. She still testified in front of you today. She still did the [d]efense interview. She went through all these things, had been consistent throughout the entire time.

VRP at 156. Defense counsel did not object.

The trial court entered written findings of fact and conclusions of law. The trial court recognized the State had the burden of proving a criminal case by proof beyond a reasonable doubt. The trial court also made the following findings regarding the evidence presented at trial:

> f. W.S.B. provided what the court would consider were several consistent statements between testimony and video audio. This included the time on the screensaver, that she noted said 11:46 or something, and in court indicated it was 11:40-something. She stated [Ball] returned from the bathroom and sat down. She

4

heard noises. He then grabbed her left wrist pulling it above her head and her hand touched his genitals; that this lasted a few minutes. She felt a speed bump at the top, fabric at the bottom. After she got up, she pinched herself to make sure she was not dreaming and washed her hands. No testimony was otherwise presented that showed the story has changed.

g. Defense counsel presented theories. That W.S.B. had been in trouble and wanted to make up with her mother. That she was coached. However, there was zero evidence there was collusion, or conspiracy to keep this façade of a story up for the last year.

Clerk's Papers (CP) 43-44. The trial court concluded that the State had proved the elements of first degree child molestation beyond a reasonable doubt.

III. SENTENCING HEARING

For sentencing, Ball appeared in a holding cell that was located inside of a Cowlitz County courtroom. Neither Ball nor his counsel objected to appearing for sentencing in the holding cell. Ball had an offender score of zero, which resulted in a standard indeterminate sentencing range of 51-68 months to life. The trial court imposed a sentence of 62 months to life and lifetime community custody. Notwithstanding that Ball was found guilty after a bench trial, section 2.1 of his judgment and sentence states that he pleaded guilty on September 15, 2023. CP at 12. Additionally, section 2.5 of his judgment and sentence states that Ball was found indigent, but the trial court imposed the $500 VPA.

Community custody conditions were attached to the judgment and sentence as Appendix H. Condition 10 in Appendix H stated, "Do not have contact with minors (persons aged under 18 years of age)." CP at 27. Condition 14 in Appendix H stated:

You must not date or become involved romantically/sexually with individuals nor form relationships with families who have minor children, unless you receive prior approval from your [Community Corrections Officer (CCO)].

CP at 27.

Ball appeals.

5

ANALYSIS

In his appeal, Ball argues that (1) the State committed prosecutorial misconduct during closing argument by relying on evidence outside the record, (2) he was subject to unconstitutional restraint during his sentencing hearing, (3) community custody conditions 10 and 14 are unconstitutional, (4) a scrivener's error on his judgment and sentence should be corrected on remand, and (5) the VPA should be struck. Ball makes six additional claims in his SAG.

Ball's arguments relating to prosecutorial misconduct and his sentencing have been waived, and none of Ball's SAG claims have merit. But we remand to the trial court to correct the scrivener's error, to strike the VPA, and to reconsider the community conditions 10 and 14.

## I. PROSECUTORIAL MISCONDUCT

Ball argues that the State committed prosecutorial misconduct during closing argument. Ball failed to object, but he contends that the misconduct was flagrant and ill-intentioned. We disagree.

In a prosecutorial misconduct claim, the defendant bears the burden of showing that the prosecutor's conduct was both improper and prejudicial. *In re Pers. Restraint of Sandoval*, 189 Wn.2d 811, 832, 408 P.3d 675 (2018), *see also State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012).

If the defendant fails to object to the State's remarks at trial, any error regarding prosecutorial misconduct is deemed to have been waived unless the misconduct was "so flagrant and ill[-]intentioned that an instruction could not have cured the resulting prejudice." *Emery*, 174 Wn.2d at 760-61. Washington courts have emphasized that the focus in such cases is less on whether the prosecutor's misconduct was flagrant or ill-intentioned and more on whether the

resulting prejudice could have been cured by a timely objection or instruction. *State v. Slater*, 197 Wn.2d 660, 885, 486 P.3d 873 (2021).

Here, Ball claims the State committed misconduct in closing argument by suggesting that the content of W.S.B.'s forensic interview and defense interview were consistent with her other statements despite the fact that neither interview was admitted into evidence. Ball acknowledges that he failed to object to the State's remarks at trial, but he argues that the prosecutor "could not have been confused" about the limited evidence presented at trial and, thus, the misstatements could not have been good faith misstatements. Br. of Appellant at 20.

We are unpersuaded. The focus of this inquiry is on curability. *See Slater*, 197 Wn.2d at 885. And we conclude that if Ball had raised a timely objection, any error would have been cured. This was a bench trial before a judge, not a jury trial. Judges are better equipped to filter out inadmissible evidence or argument, even if the information is seen or heard, than juries. *See State v. Read*, 147 Wn.2d 238, 245, 53 P.3d 26 (2002). " 'In bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions.' " *Id.* (quoting *Harris v. Rivera,* 454 U.S. 339, 346, 102 S. Ct. 460, 70 L. Ed. 2d 530 (1981)). If Ball had objected to the State's suggestion of consistency, it strains reason to conclude that the trial court would have continued to rely on the unsupported argument. *See State v. Gower*, 179 Wn.2d 851, 855, 321 P.3d 1178 (2014) (judges are presumed to know and follow the law). Thus, Ball has failed to show the State's conduct was so flagrant and ill-intentioned that an instruction could not have cured it. Accordingly, Ball's prosecutorial misconduct claim is waived.

II. APPEARANCE AT SENTENCING FROM A HOLDING CELL

Ball argues that his due process rights were violated when he appeared in an in-court holding cell for his sentencing hearing. Citing to our Supreme Court's recent decision in *State v.*

*Luthi*, Ball argues that appearing in this in-court holding cell violated his right to " 'appear in court free from unjustified restraints.' " Br. of Appellant at 22 (quoting *State v. Luthi*, 3 Wn.3d 249, 256, 549 P.3d 712 (2024)). The State argues that this claim cannot be raised for the first time on appeal because the claim does not constitute a manifest error affecting a constitutional right under RAP 2.5(a)(3). We agree with the State.

Appellate courts may refuse to review claims of error which were not first raised in the trial court. RAP 2.5(a). However, a party may raise a "manifest error affecting a constitutional right" for the first time on appeal. RAP 2.5(a)(3). An error is manifest if the appellant shows actual prejudice. *State v. J.W.M.*, 1 Wn.3d 58, 91, 524 P.3d 596 (2023). The appellant must make a plausible showing that the claimed error had practical and identifiable consequences. *Id.* "[T]o determine whether an error is practical and identifiable, the appellate court must place itself in the shoes of the trial court to ascertain whether, given what the trial court knew at that time, the [trial] court could have corrected the error." *State v. O'Hara*, 167 Wn.2d 91, 100, 217 P.3d 756 (2009).

Under this standard, the error was not manifest. At the time of Ball's sentencing, *Luthi* had not yet been decided. And no Washington court had held that a defendant's appearance at nonjury proceedings in an in-court holding cell constituted a restraint subject to due process protections. *See Luthi*, 3 Wn.3d at 258-61. Indeed, *Luthi* recognized that it was an issue of first impression. *Id.* at 260-61 ("We have not previously considered the due process implications of routinely confining defendants to an in-court holding cell for nonjury hearings."). Therefore, the trial court's error was not obvious on the record, and given what the trial court knew "at that time," it could not have corrected the error. *See O'Hara*, 167 Wn.2d at 100.

Because Ball has not shown the alleged sentencing error was manifest, we decline to consider Ball's argument regarding the in-court holding cell under RAP 2.5(a).

III. COMMUNITY CUSTODY CONDITIONS

Ball argues community custody conditions 10 and 14 are unconstitutional. Because both community custody conditions have actual or potential defects, we remand to the trial court to reconsider their language and imposition.

A. COMMUNITY CUSTODY CONDITION 10–RIGHT TO PARENT

As noted above, community custody condition 10 states simply, "Do not have contact with minors (persons aged under 18 years of age)." CP at 27. Ball argues that this community custody condition unconstitutionally interferes with his right to parent because it prevents him from being able to contact his own children.

We review community custody conditions for abuse of discretion and will reverse only if they are " 'manifestly unreasonable.' " *State v. Irwin*, 191 Wn. App. 644, 652, 364 P.3d 830 (2015) (internal quotation marks omitted) (quoting *State v. Sanchez Valencia*, 169 Wn.2d 782, 791-92, 239 P.3d 1059 (2010)). It is manifestly unreasonable to impose an unconstitutional condition of community custody. *State v. Hai Minh Nguyen*, 191 Wn.2d 671, 678, 425 P.3d 847 (2018).

Courts may impose conditions that interfere with the right to parent if it is reasonably necessary to prevent harm to a child. *State v. DeLeon,* 11 Wn. App. 2d 837, 841, 456 P.3d 405 (2020). But before the trial court can impose a condition that effectively prohibits a defendant from ever contacting their children, it "must expressly, i.e., on the record, (a) consider the constitutional right to parent, (b) explain why the no-contact provision is necessary, and (c) explore whether any viable less restrictive alternatives exist." *State v. Reedy*, 26 Wn. App. 2d 379, 392, 527 P.3d 156, *review denied*, 1 Wn.3d 1029 (2023). If the trial court fails to conduct this analysis on the record, remand is necessary for the trial court to make findings and revisit the condition before prohibiting all contact with their children. *DeLeon*, 11 Wn. App. at 842.

Here, the trial court imposed a condition prohibiting contact with all minors despite Ball having his own minor children. The record does not demonstrate the trial court considered any State interest in restricting Ball's contact with his biological children rather than with minors generally. The trial court also did not consider whether the condition is narrowly tailored. Because the trial court failed to make a record that supports imposing a community custody condition that limits Ball's contact with his biological children, we remand for the trial court to make appropriate findings or to revise community custody condition 10.

B.  COMMUNITY CUSTODY CONDITION 14–DATING AND SEXUAL RELATIONSHIPS

Ball argues condition 14 is unconstitutionally vague and overbroad. Condition 14 compels Ball to obtain approval from his CCO prior to forming relationships with anyone with minor children in their family. Community custody condition 14 states:

> You must not date or become involved romantically/sexually with individuals nor form relationships with families who have minor children, unless you receive prior approval from your CCO.

CP at 27.

Ball argues the condition's language, specifically "become involved romantically," and "form relationships," are vague. Br. of Appellant at 33-35.

A legal prohibition, like a community custody condition, is unconstitutionally vague if "(1) it does not sufficiently define the proscribed conduct so an ordinary person can understand the prohibition or (2) it does not provide sufficiently ascertainable standards to protect against arbitrary enforcement." *State v. Padilla*, 190 Wn.2d 672, 677, 416 P.3d 712 (2018). But " 'a community custody condition is not unconstitutionally vague merely because a person cannot predict with complete certainty the exact point at which [certain] actions would be classified as

prohibited conduct.' " *Id.* (internal quotation marks omitted) (quoting *Sanchez Valencia*, 169 Wn.2d at 793).

We are unpersuaded by some of Ball's argument. The prohibition on "form[ing] relationships" is not unconstitutionally vague. Our Supreme Court has found that, in context, an ordinary person could understand that a condition prohibiting a sex offender from "form[ing] relationships with persons/families with minor children" is aimed at preventing easy access to children, which is a possibility in any relationship. *In re Pers. Restraint of Ansell*, 1 Wn.3d 882, 897, 533 P.3d 875 (2023). Context shows that such a condition would prohibit the offender from accessing children through a myriad of relationships—friendly, professional, neighborly, among others. *Id.* Using this type of context, condition 14 is not unconstitutionally vague because a person of ordinary intelligence would understand that when Ball forms relationships, even merely friendly and non-intimate ones, with people who have minor children, he must first get CCO approval. *Id.*

However, Ball is correct that other parts of community custody condition 14 present a problem. The condition also prohibits becoming "involved romantically" with an individual with minor children. Our Supreme Court has found the word "romantic" in a community custody condition to be "highly subjective." *Nguyen*, 191 Wn.2d at 683. Therefore, prohibiting "romantic" relationships is unconstitutionally vague. *Id.* Accordingly, we agree with Ball that this portion of community custody condition 14 is unconstitutionally vague.

Thus, because the word "romantic" is unconstitutionally vague, we remand for the trial court to reconsider the language and imposition of this condition.[3]  *State v. Casimiro*, 8 Wn. App. 2d 245, 251, 438 P.3d 137 (2019).

IV.  SCRIVENER'S ERROR

Ball argues that his judgment and sentence contains a scrivener's error: section 2.1 states that he pleaded guilty.  A scrivener's error is a clerical mistake that, when amended, would correctly convey the trial court's intention as expressed in the record at trial.  *State v. Davis*, 160 Wn. App. 471, 478, 248 P.3d 121 (2011).  The remedy for a scrivener's error in a judgment and sentence is to remand to the trial court for correction.  *State v. Makekau*, 194 Wn. App. 407, 421, 378 P.3d 577 (2016).

The State concedes that because Ball's conviction followed a bench trial, not a guilty plea, his judgment and sentence should be remanded for correction.  We accept the State's concession, and we remand to the trial court to correct the scrivener's error.

V.  VPA

Ball argues that the VPA should be stricken because it is no longer authorized by statute. The State concedes the VPA should be stricken because Ball was found indigent.

Effective July 1, 2023, the VPA is no longer authorized for indigent defendants.  LAWS OF 2023, ch. 449 § 1; RCW 7.68.035(4).  Because the trial court found Ball indigent, we accept the State's concession and remand to the trial court to strike the VPA.

---

[3] Ball also argues that community custody condition 14 infringes on his freedom of intimate association.  Because this condition is being remanded, the trial court is not foreclosed from considering issues related to this argument.

VI.  SAG

Ball raises numerous claims in his SAG.  Ball's SAG claims lack merit.

A.  GROUND 1

In his first ground, Ball actually makes two claims—a sufficiency of the evidence claim and an evidentiary claim.  First Ball claims the State failed to prove the crime took place because it relied solely on testimony from Deputy Bauman, Alisha, and W.S.B., and the State did not call any expert witnesses or rely on physical evidence.  Evidence is sufficient to support a guilty verdict if, after viewing the evidence in the light most favorable to the State, any rational trier of fact could find that all of the elements of the crime charged were proven beyond a reasonable doubt.  *State v. Cardenas-Flores*, 189 Wn.2d 243, 265, 401 P.3d 19 (2017).  We defer to the trier of fact on issues of conflicting testimony, witness credibility, and the persuasiveness of evidence.  *State v. Ague-Masters*, 138 Wn. App. 86, 102, 156 P.3d 265 (2007).  Here, the trial court found W.S.B.'s testimony credible and W.S.B.'s testimony was sufficient to establish that Ball had sexual contact with her.  Ball's claim about the sufficiency of the evidence fails.

Second, Ball claims that the State did not initially intend to use the audio recording but then later did, so its admission constituted a procedural error.  However, Ball did not object to the admission of the audio recording.  Ball cannot raise this claim for the first time on appeal.  *See* RAP 2.5(a).  Thus, to the extent Ball claims the trial court erred by admitting the audio recording, we decline to consider this claim.

B.  GROUND 2

In his second ground, Ball identifies numerous statements from the State's closing argument that he claims were improper.  However, Ball did not object to any of these comments.  As explained above, if the defendant fails to object to the State's remarks at trial, any error

regarding prosecutorial misconduct is deemed to have been waived unless the misconduct was "so flagrant and ill[-]intentioned that an instruction could not have cured the resulting prejudice." *Emery*, 174 Wn.2d at 760-61. Here, as discussed above, a timely objection could have cured any potential improper statement by the prosecutor, especially when the finder of fact was a judge. Accordingly, Ball's additional claims of prosecutorial misconduct are waived.

C. GROUND 3

In his third ground, Ball appears to claim that his arrest violated his Fourteenth Amendment right to equal protection because Deputy Bauman arrested Ball without sufficient probable cause. Ball appears to claim that the deputy wrongfully arrested him because the deputy did not get a direct statement from W.S.B. or have any physical evidence or appearance of "a violent action." SAG at 11-12. "Probable cause" for a warrantless arrest exists if facts and circumstances within the arresting officer's knowledge, and of which he has reasonably trustworthy information, are sufficient to permit a person of reasonable caution to believe that an offense has been or is being committed. *State v. Conner*, 58 Wn. App. 90, 265, 791 P.2d 261, *review denied*, 115 Wn.2d 1020 (1990); *see generally* U.S. CONST. amend. IV. The recording of W.S.B.'s disclosure of the abuse was sufficient to establish that an offense had been committed. Thus, Deputy Bauman had probable cause to arrest Ball, and Ball's claim of an equal protection violation fails.

D. GROUND 4

Ball's fourth ground also includes two different claims related to the audio recording of W.S.B. First, Ball claims the recording was improperly admitted. As explained above, we decline to address the admission of the audio recording for the first time on appeal.

Second, Ball claims that the prosecution used the recording maliciously to "bias [the] verdict" based on "emotional persuasion." SAG at 14. Ball appears to claim that the State

14

committed prosecutorial misconduct by attempting to "inflame the passions" of the decision-maker. It is improper for prosecutors to use arguments calculated to inflame the passions or prejudices of the jury. *State v. Thierry*, 190 Wn. App. 680, 690, 360 P.3d 940 (2015), *review denied*, 185 Wn.2d 1015 (2016). However, this was a bench trial, and trial courts are presumed to know and apply the law when hearing a bench trial. *See Read*, 147 Wn.2d at 245. " 'In bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions.' " *Id.* (quoting *Harris*, 454 U.S. at 346). Therefore, even if the State made inflammatory arguments based on the audio recording, Ball cannot show they caused prejudice by causing the trial court to reach its verdict based on considerations other than the evidence presented. *See State v. Thorgerson*, 172 Wn.2d 438, 442-43, 258 P.3d 43 (2010) (appellant must show State's conduct was prejudicial in order to prevail on a claim of prosecutorial misconduct).

E. GROUND 5

In his fifth ground, Ball claims the trial court erred by shifting the burden of proof to the defendant. Ball appears to rely on the trial court's finding that there was no evidence supporting the defense theories of collusion or conspiracy to fabricate the accusations. Due process requires the prosecution to prove every element of a crime beyond a reasonable doubt. U.S. CONST. amend. XIV; WASH. CONST. art. I, § 3; *State v. Johnson*, 188 Wn.2d 742, 750, 399 P.3d 507 (2017).

Here, the trial court did find that Ball failed to support his allegations of conspiracy or collusion. However, in the context of the record as a whole, the trial court did not relieve the State of its burden to prove the charges beyond a reasonable doubt. The trial court correctly identified the State's burden in its findings and identified the evidence, particularly W.S.B.'s testimony, which supported the findings. Further, the trial court concluded that it was "convinced beyond a reasonable doubt" that the elements of the crime were proved. CP at 44. Therefore, Ball has failed

to demonstrate that the trial court applied the incorrect standard, improperly shifted the burden to the defendant, or relieved the State of its burden to prove all elements of the crime beyond a reasonable doubt.

F. GROUND 6

In his sixth additional ground, Ball claims the trial court imposed an excessive sentence that violated his Eighth Amendment right. Ball does not identify any specific error in determining his sentence, only that, given this is his first offense and he has otherwise been a good father and positive community member, a standard range based on offense seriousness level of 10 is excessive.[4] The Eighth Amendment prohibits cruel and unusual punishment. *Miller v. Alabama*, 567 U.S. 460, 469, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). "Subject to limits imposed by the [E]ighth [A]mendment to the United States Constitution, the legislature has the power to define criminal conduct and set out the appropriate punishment." *In re Pers. Restraint of Percer*, 150 Wn.2d 41, 49, 75 P.3d 488 (2003). The seriousness level is set by the legislature relating to the crime itself, not the offender, and the legislature has determined first degree child molestation has a seriousness level of 10. RCW 9.94A.515. Ball does not support his claim that his punishment violates the Eighth Amendment with anything besides this being his first offense, which is already accounted for in his offender score. Because Ball received the punishment prescribed by the legislature for his offense, his claim lacks merit.

---

[4] To the extent that Ball claims it is a constitutional violation to subject him to the jurisdiction of the Indeterminate Sentencing Review Board (ISRB) because the ISRB will not release him unless he admits his guilt, this claim relies on facts outside the record, including the decision-making process of the ISRB, and will not be considered on direct appeal. *State v. McFarland*, 127 Wn.2d 322, 338, 899 P.2d 1251 (1995).

CONCLUSION

We affirm Ball's conviction, but we remand to the trial court to reconsider the language and imposition of community custody conditions 10 and 14, to correct the scrivener's error in the judgment and sentence, and to strike the VPA.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

MAXA, P.J.

LEE, J.